UNITED STATES of America,
Plaintiff,

v.

Willie REYNOLDS, Jr., Dennis
McCord, Defendants.

Civil Action No. 1:06–CR–517–BBM.

United States District Court,
N.D. Georgia,
Atlanta Division.

Dec. 11, 2007.

Zahra S. Karinshak, Office of United States Attorney, Atlanta, GA, for Government.

Brian Steel, The Steel Law Firm, Atlanta, GA, for Defendant Reynolds.

Noah H. Pines, Law Office of Peter J. Ross, Atlanta, GA, for Defendant McCord.

### ORDER

BEVERLY B. MARTIN, District Judge.

This matter is before the court on a number of motions to suppress evidence filed by Defendants Dennis McCord ("Mr. McCord") and Willie Reynolds, Jr. ("Mr.Reynolds") [Doc. Nos. 16, 31, 32, 42, and 44], as well as Mr. Reynolds's Motion to Suppress Statements [Doc. No. 30].

### I. *Factual and Procedural Background*

The following facts are taken primarily from the testimony of Fulton County Deputy Sheriffs Corey Henry ("Deputy Henry") and J.T. Brown ("Deputy Brown"). Deputy Henry testified before Magistrate

Judge King on April 26, 2007 ("Henry Transcript"). Deputy Brown testified before this court on November 21, 2007. While the court will refer to the transcript of Deputy Henry's testimony, that of Deputy Brown has not been transcribed, and the court has relied upon its notes from the November 21, 2007 proceeding. Because the court has the transcript of Deputy Henry's testimony, it recites his testimony in more detail.

On November 22, 2006, Deputies Henry and Brown attempted to execute a warrant for the arrest of Quentin Miles ("Mr. Miles") on a misdemeanor traffic violation. (Henry Tr. 8–9, 11.) The deputies were employed in the Warrant Services Division of the Fulton County Sheriff's Department. Their responsibilities included executing foreign warrants from other counties in the state, sometimes as many as 20 in a night. The shift was from midnight to 8:00 a.m. (*Id.* at 6–7, 12.) The warrant for Mr. Miles originated from Crisp County, Georgia. (*Id.* at 9.) It described Mr. Miles as 6 feet, 2 inches tall, weighing about 160 pounds, with brown eyes and black hair. Mr. Miles's race was not indicated. (*Id.* at 40.) The address on the warrant was 2151 Alan Drive S.W., Atlanta, Georgia. (*Id.* at 11.)

Before going to the address on the warrant for Mr. Miles, one of the deputies called Crisp County to confirm the address and that the warrant was still valid. (*Id.*) Neither deputy engaged in any further investigation to make sure the address was one at which Mr. Miles could be found. (*Id.* at 41.)

Deputies Henry and Brown arrived at the 2151 Alan Drive address at approximately 4:49 a.m. Deputy Henry observed surveillance cameras mounted on the corners of the front of the house. (*Id.* at 12.) Deputy Brown went around to the back of the house and Deputy Henry approached the front. Deputy Henry saw a light on in the front room of the house, and tapped on the window. (*Id.* at 13.) A man later identified as Dennis McCord opened the carport door on the side of the house. Deputy Henry went to the side of the house to meet him. (*Id.* at 13–14.)

Deputy Henry identified himself to Mr. McCord and asked if he could come inside. Mr. McCord responded, "okay," and stepped away from the doorway to allow the deputy into the kitchen. (*Id.*) Once inside, Deputy Henry told Mr. McCord that he had an arrest warrant for Mr. Miles. According to Deputy Henry, Mr. McCord told the officer his name, said that he was just visiting the house, and stated that he did not know of anyone in the house by the name of Quentin Miles. (*Id.* at 14.) Mr. McCord also told Deputy Henry that his cousin was asleep in the back bedroom. At that point, Deputy Brown had arrived in the kitchen, and Deputy Henry directed Deputy Brown to investigate the back bedroom. (*Id.* at 14–15.) He specifically told Deputy Brown to make sure that he got identification from the person in the back bedroom. (*Id.* at 15.)

Again according to Deputy Henry's testimony, Deputy Brown returned to the kitchen with another man, Willie Reynolds. Deputy Henry then "directed" or "asked" the two men to leave the kitchen and go into the living room. (*Id.*) It is unclear from Deputy Henry's testimony whether the officers identified Mr. Reynolds before or after they moved to the living room. He testified first that he did not know Mr. Reynolds's name until they were in the living room, but later stated that he had both Mr. McCord's and Mr. Reynolds's IDs before leaving the kitchen. (*Id.* at 16, 52.) Deputy Henry stated that his purpose for moving into the living room was "to investigate to see if the other gentleman [Mr. Reynolds] knew Quentin Miles

or if Quentin Miles was inside the residence."[1] (*Id.* at 15–16.)

Deputy Brown testified that Deputy Henry and Mr. McCord were already in the living room when he brought Mr. Reynolds back to that part of the house, and he does not know what was said between Deputy Henry and Mr. McCord to precipitate the move to the living room.[2]

Once in the living room, Deputy Henry observed a fully loaded magazine for a .223 assault rifle on the coffee table, as well as a small weight scale and a holster for another firearm. (*Id.* at 17.) He also noticed a television monitor showing surveillance photos from various angles around the outside of the house. (*Id.*)

After recounting these facts, Deputy Henry also testified that he had smelled the "strong smell or odor of marijuana" upon entering the kitchen, which he recognized due to his experience and training as an officer. (*Id.* at 18.) That fact was not included in either Deputy Henry's written report made shortly after the incident, (*see id.* at 71–72), or in the application for the search warrant of the house made the same day. (Joint Br. in Supp. of Defs.' Mots. to Suppress Evidence 6–7.) Deputy Brown testified that he had no memory of the smell of marijuana. Furthermore, both Deputy Henry and Deputy Brown testified that Mr. McCord, the only occupant of the house who was awake at the time the deputy now recalls smelling marijuana, did not appear to be under the influence of alcohol or drugs. (Henry Tr. 32–33.) Again, the court finds Deputy Henry to be credible, but is aware that his testimony took place over five months after the arrest occurred, and described a time frame during which he typically served a large volume of warrants. (*Id.* at 11–12.) Against Deputy Henry's recollection of the smell of marijuana weigh (1) the fact that the odor of marijuana was mentioned in neither the Deputy Brown's report nor the application for a warrant, both written close in time to the arrest; (2) the testimony of both officers that Mr. McCord did not appear under the influence of alcohol or drugs; and (3) the fact that Deputy Brown did not remember smelling marijuana. Applying the preponderance of the evidence standard, there is not sufficient evidence to support a finding that the house smelled of marijuana. Thus the court finds there was no smell of marijuana when the deputies came into the house.

Deputy Henry informed Mr. McCord and Mr. Reynolds that he needed to be sure Mr. Miles was not in the house. This is another point on which the recollection of the deputies parts ways. Deputy Brown recalled that Mr. McCord actually called Mr. Miles, got him on the telephone, and told the deputies that Mr. Miles was en route. In any event, while Deputy Brown remained in the living room with

---

1. Deputy Henry also noted that there were no chairs or other seating in the kitchen, (*id.* at 15), and, later in his testimony, that there were no lights in that room. (*Id.* at 52–53.)

2. There were a number of differences in Deputy Henry's recollection of events as opposed to the recollection of Deputy Brown. The court has no doubt that both officers were attempting to recall the events as best they could, and attributes the difference of recollections largely to the passage of time between the arrest of defendants in this case and the time the officers testified. For Deputy Henry, approximately five months passed between the arrests and his testimony, and for Deputy Brown, one year had passed. The passage of time can only have made more difficult the already challenging job of isolating the events associated with the arrests of these defendants from the large number of other encounters the deputies had serving up to 20 warrants per 8–hour shift over the years they worked in the Warrant Services Division. Deputy Henry served in that division for over three years (*id.* at 7), and Deputy Brown worked in that division for five years.

the two men, Deputy Henry engaged in what he termed a "protective sweep" of the top portion of the house.[3] (*Id.* at 18–19.) In the course of this first sweep, Deputy Henry went through the house and to the back bedroom. The closet in that bedroom was open, and there was a thirty-gallon trash can sitting at the threshold of the closet. Deputy Henry looked both in the closet and in the trash can in case anyone was hiding in either. (*Id.* at 19–20.) In the trash can, Deputy Henry observed "two large ziploc bags of suspected marijuana." (*Id.* at 19.) Deputy Henry called out to Deputy Brown, still in the living room, to tell him of his discovery. Also while in the bedroom, Deputy Henry heard a beeping sound, which turned out to be another small scale on the floor of the bedroom. (*Id.* at 20.) After making these discoveries, Deputy Henry returned to the living room.

As he re-entered the living room, Deputy Henry noticed a handgun resting on the arm of the sofa. He asked to whom the weapon belonged and both Mr. McCord and Mr. Reynolds said they did not know. He then secured the gun and used the radio to relay the serial number on the gun in an effort to identify its owner. At that point, Mr. Reynolds spoke up and stated that the weapon was his. (*Id.* at 20–21.) Deputy Henry also saw "the butt of a stock of a gun" and a strap sticking out from underneath the sofa. He secured that weapon as well. (*Id.* at 21–22.) While Deputy Henry continued to run the serial number of the first gun over the radio, Deputy Brown announced that he would do another sweep to see if anyone else was in the house. The deputies had placed Mr. McCord and Mr. Reynolds in handcuffs by that time. (*Id.* at 22–23.)

Deputy Brown returned from the second sweep with a shotgun he had found. The officers also noticed another rifle leaning against the front door. (*Id.* at 24.) Deputy Henry contacted his sergeant, who arrived at the house. At this point, the deputies undertook to obtain a search warrant, one was issued, and the house was more fully searched. During this search the deputies discovered more weapons, more marijuana, and also cocaine. (*Id.* at 29–30; Incident Report of Deputy Henry, Nov. 22, 2006.) Mr. McCord and Mr. Reynolds were charged with possession of cocaine with the intent to distribute and possession of firearms in furtherance of a drug trafficking crime. Mr. Reynolds was also charged as being a felon in possession of a firearm.

Mr. McCord and Mr. Reynolds have moved to suppress the evidence that was discovered in the 2151 Alan Drive house, on the ground that the various searches conducted by Deputies Henry and Brown violated their Fourth Amendment rights. Mr. Reynolds has also moved to suppress his statements to law enforcement officers.

## II. Standard of Review

The Fourth Amendment prohibits "unreasonable searches and seizures." The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (citation and quotations omitted). Warrantless searches of the home are presumptively unreasonable. *Id.* at 586, 100 S.Ct. 1371. Courts depart from "the general rule requiring a warrant as a prerequisite for a search in only a few, exceptional circumstances." *United States v. McGough*, 412

---

3. Deputy Henry referred to the "top portion" of the house in contrast to the basement. (*Id.* at 19.)

F.3d 1232, 1237 (11th Cir.2005). The burden of proving that a relevant exception to the warrant requirement applies rests with the government. *Id.* at 1237 n. 4.

## III. *Analysis*

### A. Entry to the Home

■ Deputy Henry clearly had authority to approach and enter the house at 2151 Alan Drive.[4] An officer is permitted under the Constitution to approach an individual's house and knock on the door when armed with an arrest warrant for that individual. *United States v. Floyd,* No. 07–10005, 2007 WL 2004401, at *5 (11th Cir. July 12, 2007). The officers in this case believed that Mr. Miles resided at 2151 Alan Drive when they approached. Deputy Henry had a valid warrant for the arrest of a person he believed resided at the house. He did not violate the Constitution by knocking on the door and questioning the occupants in order to execute the warrant.[5]

### B. The Searches Inside the House

The court views this case as involving four distinct events requiring a Fourth Amendment analysis: Deputy Brown's entry to the back bedroom to retrieve Mr. Reynolds, the officers' entry into the living room, Deputy Henry's first sweep, and Deputy Brown's second sweep. For the reasons already discussed, the court finds the officers' approach to the house and entry into the kitchen to be lawful. The court will analyze whether each of the remaining four events were lawful under various exceptions to the warrant requirement of the Fourth Amendment.

#### 1. Consent

■ A consensual search does not violate the Constitution, even in the absence of a warrant or probable cause. *United States v. Garcia,* 890 F.2d 355, 360 (11th Cir.1989). Consent may be obtained either by the person whose property is searched, or by "a third party who pos-

4. The magistrate judge found that the officers had authority under the so-called "knock and talk" doctrine, which allows an officer to initiate a consensual encounter as an investigative technique or on reasonable suspicion of criminal activity. *United States v. Jones,* 239 F.3d 716, 720 (5th Cir.2001) ("Federal courts have recognized the 'knock and talk' strategy as a reasonable investigative tool when officers seek to gain an occupant's consent to search *or* when officers reasonably suspect criminal activity." (emphasis added)) (citing *United States v. Tobin,* 923 F.2d 1506, 1511 (11th Cir.1991) (en banc)). The officer may not, however, gain entry to the house by way of any show of official authority. *United States v. Ramirez–Chilel,* 289 F.3d 744, 751 (11th Cir.2002); *see Tobin,* 923 F.2d at 1512. Deputy Henry tapped on the front window of the house to attract attention. Mr. McCord opened the side door, at which point Deputy Henry identified himself as a police officer. He asked if Mr. McCord would mind if they went inside, and Mr. McCord consented. (Henry Tr. at 13–14.) Deputy Henry's entry into the house does not appear to have been occasioned by any show of official authority.

*Compare United States v. Edmondson,* 791 F.2d 1512, 1514 (11th Cir.1986) (holding that an agent's command of "F.B.I. Open the door," was an official show of authority, particularly when the occupant opened the door, stepped back, and placed his hands on his head) *with Tobin,* 923 F.2d at 1512 (finding that plain clothes agents without weapons drawn who knocked continuously for three to four minutes while calling out requests to the occupants to open the door did not make a showing of official authority).

5. The warrant to be executed in *Floyd* was a misdemeanor warrant, as in this case. *Floyd* did not address the different authority officers might have, if any, to approach a house when executing a misdemeanor warrant as opposed to a felony warrant. This court recognizes the authority of Deputies Henry and Brown to approach the house and knock on the door on the basis of a misdemeanor warrant. However, the court believes that the minor nature of the crime for which the warrant had been issued does play a role in the analysis of the reasonableness of the officers' searches through the house, discussed below.

sesses common authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). Common authority is based on "mutual use of the property by persons generally having joint access or control for most purposes." *Id.* (citation and quotations omitted). It must appear to the objective, reasonable officer that the consenting person does in fact have common authority for consent to be valid. *Id.* at 186, 188, 110 S.Ct. 2793.

■ The voluntariness of consent is determined by the totality of the circumstances. The factors include "whether the defendant was free to leave, whether there was coercive police procedure, the extent of the defendant's cooperation or awareness of a right to refuse consent, [and] whether the defendant could refuse to consent," among other things. *United States v. Ramirez–Chilel*, 289 F.3d 744, 752 (11th Cir.2002). Consensual searches are limited to the terms of their authorization. *United States v. Strickland*, 902 F.2d 937, 941 (11th Cir.1990).

The sequence of events shows that Deputy Henry stepped into the kitchen on the reasonable belief that Mr. McCord had the authority to invite him in. Mr. McCord was in the house shortly before 5:00 a.m. and answered Deputy Henry's knock. It was reasonable for Deputy Henry to believe that Mr. McCord resided in the house and that he therefore had common authority over it. Almost immediately upon entering the house, Deputy Henry learned that Mr. McCord did not live there. (Henry Tr. 14.) Mr. McCord also told the deputy that his cousin, Mr. Reynolds, was asleep in the back bedroom. Deputy Henry instructed Deputy Brown to go to the back bedroom and bring Mr. Reynolds to the kitchen. Neither deputy asked Mr. McCord's consent to venture further into the house, and at that juncture, it would not have been reasonable to rely on Mr. McCord's grant of permission to come into the kitchen to, in turn, move throughout the house. However, the officers discovered nothing incriminating during Deputy Brown's brief foray into the back bedroom. Holding that search to be unlawful would be of no effect, therefore, because it uncovered nothing that could be suppressed.

■ Once Mr. Reynolds joined Mr. McCord in the kitchen, Deputy Henry asked to move into the living room.[6] The record does not reflect whether Mr. Reynolds made any representations about whether he lived in the house or not. When the officers encountered Mr. Reynolds, he was asleep in a bedroom in the house. Given the time of night and where he was found, it was reasonable for the deputies to conclude that Mr. Reynolds had common authority over the residence. While Deputy Henry did not testify as to whether Mr. Reynolds gave permission or expressly acquiesced to his request to go to the living room, neither is there any record that either Mr. Reynolds or Mr. McCord objected to moving into the living room. The court is aware that body language can indicate implied or tacit consent to a search. *United States v. Chrispin*, 181 Fed.Appx. 935, 939 (11th Cir.2006) (citing *Ramirez–Chilel*, 289 F.3d at 752). Therefore, the entry into the living room was lawful because a person with common authority over the house gave tacit consent.

6. Again, the court is reciting from Deputy Henry's testimony. Deputy Brown testified that Deputy Henry and Mr. McCord were already in the living room when he returned with Mr. Reynolds from the back bedroom. Thus under Deputy Brown's version, no permission for Deputy Henry to move from the kitchen to the living room could have come from Mr. Reynolds.

■ Once in the living room, Mr. McCord and Mr. Reynolds were not free to leave. (Henry Tr. 76–77.) Though they were not in handcuffs, the court finds that there was coercive police presence at that point. The encounter took place at night, when the appearance of police officers on one's doorstep tends to be more coercive than during the day. *Ramirez–Chilel,* 289 F.3d at 751 n. 8. In contrast to Deputy Henry's earlier request to move to the living room, Deputy Henry simply told Mr. McCord and Mr. Reynolds that he was going to look through the house for Mr. Miles. (Henry Tr. 18, 53.)[7] That the officers did not attempt to seek permission from either occupant to search the house indicates that the defendants were not able to refuse consent. Without specifically addressing the rest of the *Ramirez–Chilel* factors, the totality of the circumstances indicates that Deputy Henry's first sweep was not a consensual search, based on Deputy Henry's acknowledgment that the men were not free to leave and the coercive way in which he informed them of, rather than requested, the search. By the time of Deputy Brown's second sweep, both Mr. McCord and Mr. Reynolds were in handcuffs. (*Id.* at 22.) The court finds that the second sweep was likewise not consensual.

### 2. Protective Sweep

■ When an officer is arresting an individual in his home, the officer may engage in a warrantless "protective sweep" to ensure that the surrounding area does not pose a danger to the officer. *United States v. Delgado,* 903 F.2d 1495, 1502 (11th Cir.1990) (citing *Maryland v. Buie,* 494 U.S. 325, 334, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990)). The protective sweep must be supported by "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie,* 494 U.S. at 334, 110 S.Ct. 1093. As with all searches, the analysis is objective and the search is to be evaluated from the perspective of the reasonable officer. *See id.* at 332–34, 110 S.Ct. 1093. A warrant is not required to carry out a protective sweep. *Delgado,* 903 F.2d at 1502.

However, protective sweeps are inherently narrow searches. A protective sweep must be only a "cursory inspection of those places where a person may be found." *Buie,* 494 U.S. at 335, 110 S.Ct. 1093. It is also limited in time. "The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335–36, 110 S.Ct. 1093.

The protective sweep must be supported by articulable facts. *Id.* at 334, 110 S.Ct. 1093. For example, in *United States v. Tobin,* the occupant of the house opened his door to the officers' knock and stated that no one else was in the house, when officers surveilling the property had seen one man knock on the door and enter after it was opened from inside. Eventually, a second occupant of the house came forward. The police also observed three cars in the driveway and front yard of the house. Based on the occupant's lies and the presence of three cars, a protective sweep was justified because the officers reasonably believed that a third person might be hiding in the house. *Tobin,* 923 F.2d 1506, 1513 (11th Cir.1991) (en banc).

---

7. Of course, if the court accepts Deputy Brown's testimony that Mr. McCord had telephoned Mr. Miles, and that Mr. Miles was en route, this fact would render further searches for Mr. Miles inside the house unnecessary and unreasonable.

Similarly, where the police knew that a suspect had a roommate and their investigation revealed "strong indications" that the suspect did not operate alone in his drug trafficking business, the arresting officers are entitled to sweep the house for other occupants. *United States v. Hromada*, 49 F.3d 685, 687, 690 (11th Cir.1995). In *United States v. Bervaldi*, 226 F.3d 1256, 1263–64 (11th Cir.2000), officers executing a felony warrant on a suspect had reason to believe he was in the house based on previous investigation and the presence of his car out front at the time. When they entered the house and found a man who was not the suspect, along with a cocked but unloaded pistol lying nearby, the ensuing protective sweep was justified to make sure the suspect was not elsewhere in the residence. *Id.* at 1267–68; *see also United States v. Minor*, 227 Fed. Appx. 863, 865 (11th Cir.2007) (holding a protective sweep of the outside yard valid because the suspect had fired on police earlier and the officers had specific information that he may have booby-trapped the yard).

■■■■ By contrast, a mere lack of information about who or what is inside a building is not enough to justify a protective search of that building. *United States v. Chaves*, 169 F.3d 687, 692 (11th Cir.1999) (holding entry into a warehouse 45 minutes after making the arrest, with no other specific facts in support, not a valid protective sweep). Deputy Henry "didn't know if anyone else was in the house or not." (Henry Tr. 52.)[8] Protective sweeps may not be carried out on the strength of an "inchoate and unparticularized suspicion or hunch." *Chaves*, 169 F.3d at 692 (quoting *Buie*, 494 U.S. at 332, 110 S.Ct. 1093; *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)); *see also*

*United States v. Sunkett*, 95 F.Supp.2d 1367, 1372–73 (N.D.Ga.2000) (Story, J.) (rejecting as insufficient evidence that another person could be in the house the facts that "at some unspecified previous time, someone in the management office had seen individuals going in and out of the apartment, that defendant had a wife or girlfriend in [a nearby county], and that she had paid his rent for the month on his ... apartment").

Deputy Henry testified that his policy when executing a warrant was to look through the house wherever the suspect named on the warrant might be found. (Henry Tr. 63–64.) By definition, protective sweeps within the meaning of *Buie* cannot be based on general policy. *See United States v. Hauk*, 412 F.3d 1179, 1187 (10th Cir.2005); *cf. Florida v. J.L.*, 529 U.S. 266, 272–73, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (declining to adopt a firearm exception to stop-and-frisk *Terry* analysis); *Mincey v. Arizona*, 437 U.S. 385, 390–91, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (rejecting an exception to the warrant requirement for searches of homicide scenes). A protective sweep requires specific and articulable facts to justify it. At the same time, even if the deputies were relying solely on their policy of always looking throughout a house when executing a warrant, their actions will be upheld as valid protective sweeps *if they were objectively reasonable*. The subjective intentions of the officers are irrelevant to Fourth Amendment analysis. *Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). If the situation confronting Deputies Henry and Brown was such that a reasonable officer would have believed that the house pre-

8. Again, the court is mindful of Deputy Brown's testimony that Mr. Miles had been contacted and was en route to the house, which would indicate he was not in the house.

sented a danger, then the two sweeps made by the officers were lawful.

■ At the time Deputy Henry left the living room to look through the rest of the house, there were no specific and articulable facts to uphold a protective sweep. The first occupant of the house the officers encountered was Mr. McCord, who appeared "startled and shocked" to Deputy Henry, (Henry Tr. 32), but presented no threat to the officers.[9] Deputy Henry specifically noted that Mr. McCord did not appear to be under the influence of alcohol or drugs. (*Id.* at 33.) Deputy Brown also testified to this fact. When asked, Mr. McCord promptly reported the presence of his cousin, the only other occupant of the house, sleeping in the back room. Mr. Reynolds was brought out of the bedroom and also behaved cooperatively.

That the arrest warrant gave 2151 Alan Drive as the address where Mr. Miles could be found certainly indicates that Mr. Miles might in fact be there. However, as discussed in further detail below, Deputies Henry and Brown could not reasonably believe that Mr. Miles was present in the house at the time. They did no investigation into the warrant beyond verifying that it was still valid and that the address had been transcribed correctly, and they encountered two men in the house who produced identification and denied that Mr. Miles was there. *Bervaldi* is distinguishable for two reasons. In *Bervaldi*, 226 F.3d at 1263–64, the police had done exten-

sive investigation, lasting over six months, into the location of the suspect to be arrested and observed his car in front of the house at the time they entered. Also in *Bervaldi*, the encounter in the home unfolded very rapidly: the individual who answered the door attempted to slam it on the police, then ran, and was captured inside the house near a cocked pistol. *Id.* at 1258–59. The officers reasonably believed the suspect could be loose in the house somewhere, and did not have time to confirm this belief with the man who had opened the door.

In this case, Deputy Henry saw a loaded magazine for an assault rifle on the living room coffee table, along with a holster. Those items clearly give rise to the inference that there were multiple guns in the house. However, at the time the deputies saw the guns, they had no reason to believe that anyone else was present. Guns found at the time of arrest do not necessarily imply the presence of other individuals hidden in the residence. *See id.* at 1268 n. 13. If any danger was facing the officers, it was most likely coming from the two men seated before them on the couch.

Neither officer pointed to any specific facts, such as a noise in the house, or an unaccounted-for vehicle parked out front,[10] that would have caused them to suspect another person was in the house.[11] Deputy Henry emphasized that it was unusual for a house to have surveillance cameras mounted out front, (Henry Tr. 12), but

---

9. The court does not find it unusual that an individual would appear startled or even shocked to find a police officer at his front door in the very early morning hours.

10. In fact, Deputy Henry observed only two cars at the house, one in the carport and one parked in the backyard. (Henry Tr. 43.)

11. Both Mr. McCord and Mr. Reynolds initially denied ownership of the assault rifle to which the magazine on the coffee table be-

longed. (Henry Tr. 17.) This could suggest that a third person owned the weapon, and therefore a third person was elsewhere in the house. However, the court finds it more reasonable that one or both of the two men in the living room owned the gun and simply denied knowledge of it when asked by a police officer. Again, simply finding a gun while arresting an individual does not, without more, lead to the reasonable inference that there is another individual hiding in the house. *Bervaldi*, 226 F.3d at 1268 n. 13.

admitted that he had no evidence that the house was a drug house or otherwise a violent location. (*Id.* at 72.) Deputy Brown testified that Mr. Reynolds and Mr. McCord were never a threat, and he heard nothing to indicate another person was in the house. Because the officers can point to no specific and articulable facts that would have caused a reasonable officer to believe that the house harbored an individual posing a danger to them, the court finds that neither Deputy Henry's first sweep nor Deputy Brown's second sweep were valid protective sweeps. Thus, the protective sweep exception to the warrant requirement does not apply.

### 3. Authority under the Misdemeanor Arrest Warrant

■ "If there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law." *Payton,* 445 U.S. at 602–03, 100 S.Ct. 1371. An arrest warrant therefore includes the limited authority to enter the house in which the suspect lives on the reasonable belief that he is there. *Id.* at 603, 100 S.Ct. 1371. This limited authority must be supported by the reasonable belief, from the totality of the circumstances, that "the location to be searched is the suspect's dwelling, and that the suspect is within the residence at the time of entry." *Bervaldi,* 226 F.3d at 1263 (citation and quotations omitted). "Common sense factors," such as the time of day, are to guide courts in analyzing whether there was a reasonable belief as to both whether the location was the suspect's residence and whether he was home

at the time. *Id.; United States v. Magluta,* 44 F.3d 1530, 1535 (11th Cir.1995).

Upon lawful entry to the house, some search for the suspect, limited to the places where a person might be found, may be necessary. *United States v. Woods,* 560 F.2d 660, 666 (5th Cir.1977); *United States v. Cravero,* 545 F.2d 406, 416 (5th Cir.1977) [12] ("While the ultimate objective of an arrest entry is an arrest, the arrest can only be effected if the subject is first found, and thus a search is a necessary factual prerequisite to the possible arrest."); *see Nash v. Douglas County,* 733 F.Supp. 100, 105 (N.D.Ga.1989) (Hall, J.).

■ There is very little by way of "common sense factors" in the record, beyond the bare address on the warrant, to suggest that Mr. Miles would be found in the residence. Deputy Brown called Crisp County to confirm the address and that the warrant was still active. No further investigation was done. (Henry Tr. 41–43.) The dearth of evidence upon which the officers apparently relied supports the court's conclusion that Deputies Henry and Brown did not in fact have a reasonable belief either that 2151 Alan Drive was Mr. Miles's address or that Mr. Miles could be found there at the time.

Deputies Henry and Brown attempted to execute a misdemeanor warrant from a foreign jurisdiction. They had no knowledge of whether the information on the warrant was valid, and conducted no investigation of their own. The warrant provided limited detail, failing even to provide a complete description of the wanted man.[13] (*Id.* at 40–41.) The officers had confirmed with the issuing locale that the address

---

12. Decisions of the former Fifth Circuit handed down prior to October 1, 1981, are binding on this court. *Bonner v. Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

13. Mr. Miles's race was not included on the warrant form, though his age, height, weight, hair color, and eye color were. (Henry Tr. 40.)

was accurate, and the time of night suggested that a person living there would be home. *See Magluta*, 44 F.3d at 1535. Assuming that the officers' belief that the address was Mr. Miles's and that he would be there was reasonable thus far, that belief would be rebutted by subsequent findings and contrary evidence. *See id.*

The first person the officers encountered at the 2151 Alan Drive residence was not Mr. Miles, who informed them that no one with that name was in the house. The second and only remaining person the officers encountered was also not Mr. Miles, who reiterated that Mr. Miles was not present in the house. Both men produced identification to confirm that they were not Mr. Miles. Mr. McCord was forthcoming with information about the only other occupant of the house, Mr. Reynolds, and indeed, according to Deputy Brown, Mr. McCord called Mr. Miles because he was away from the house.

The court also finds it important that the warrant in this case was a misdemeanor warrant, based on a minor traffic violation.[14] It is simply not reasonable for officers, in executing a misdemeanor warrant, to arrive at a house with nothing more than an address given to them by a foreign law enforcement agency, and search through the house for the suspect, after the occupants of the house have established their identities. *See Wanger v. Bonner*, 621 F.2d 675, 681 (5th Cir.1980).[15]

Even assuming that the officers were reasonable in believing that the address on the warrant was accurate and reflected Mr. Miles's residence, they were not reasonable, in light of Mr. McCord's and Mr.

Reynolds's statements to the contrary and the absence of any other reason to believe that any other person was currently inside the house, in continuing to believe that Mr. Miles could be found there. The court is well aware that people sometimes lie to officers bearing arrest warrants, but the officers in this case have pointed to no facts indicating that they believed either Mr. McCord or Mr. Reynolds was lying. The court therefore finds that, whatever authority a misdemeanor arrest warrant gives an officer to approach a house and question the inhabitants, that authority does not extend to a warrantless, repeated, and ultimately unreasonable search of the house.

### C. Motion to Suppress

■ It is not a violation of the Fourth Amendment to seize objects that are in plain view of the officer, so long as he is lawfully in the place where the evidence is viewed and its illegal or incriminating nature is immediately apparent. The officer who sees the object must have lawful right of access to it before he may seize it. *Horton v. California*, 496 U.S. 128, 136–37, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990).

■ Deputy Henry observed a magazine for an assault rifle, a holster, and a scale on the coffee table in the living room. During the course of the officers' trips in and out of the living room, they also noticed a handgun sitting on an arm of the sofa, the strap and butt of an assault rifle under the sofa, and another rifle leaning against the front door. (Henry Tr. 20–21, 24.) These items were all lying out in the open. Though the officers did not notice

---

**14.** *Payton* was only concerned with felony arrests. *Welsh v. Wisconsin*, 466 U.S. 740, 749 n. 11, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984).

**15.** The *Wanger* court found important the additional fact that "in approximately twenty to

twenty-five percent of similar instances the warrant address is incorrect." *Wanger*, 621 F.2d at 682. The record before this court does not reflect how often the addresses on warrants served by Deputies Henry and Brown were incorrect.

the handgun or two rifles immediately, the officers were lawfully present in the living room and could have observed them as soon as they entered the room. The unreasonable actions of the officers were the searches throughout the rest of the house. It was reasonable for the deputies to question Mr. McCord and Mr. Reynolds about the whereabouts of Mr. Miles, and they had tacit consent to enter the living room. Thus the court finds that the deputies observed the handgun and two rifles in plain view while lawfully in the living room.

■ Evidence observed in plain view during a protective sweep may be used to secure a search warrant. *Magluta,* 44 F.3d at 1538. However, as discussed above, the officers did not engage in a lawful protective sweep of the house. There were no specific, articulable facts that gave Deputies Henry and Brown the authority to perform a series of protective sweeps. Nor, under the facts of this case, did the officers have the right to look repeatedly and extensively through the house to find the person named on the misdemeanor warrant. Deputy Henry was therefore not lawfully in the place where he observed the ziploc bags of marijuana in the trash can. Likewise, Deputy Brown was not lawfully in the bedroom where he found the shotgun. Furthermore, this evidence cannot be used in support of a search warrant. The motion to suppress will be granted as to the evidence discovered during the sweeps by Deputies Henry and Brown and during the search pursuant to the warrant, namely, all evidence aside from the guns and other items that were observed in plain view in the living room.

### D. Mr. Reynolds's Statements[16]

■ When an individual is to be subjected to custodial interrogation, he must first be warned that he has a right to remain silent, that any statement he makes may be used as evidence against him, and that he has the right to have an attorney present. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way." *Id.* The individual must be advised of his rights under *Miranda* before the interrogation begins. *United States v. Muegge,* 225 F.3d 1267, 1269–70 (11th Cir. 2000).

A person may be in custody even if he has not yet been formally arrested. If a reasonable man would feel restrained in a way that could be "fairly characterized as that degree associated with a formal arrest to such extent that he would not feel free to leave," then he is in custody. *Id.* at 1270 (citations and quotations omitted). The test is objective, and the perspective is that of the "reasonable innocent person." *United States v. Moya,* 74 F.3d 1117, 1119 (11th Cir.1996). The analysis is of the totality of the circumstances: "the 'coercive environment' that exists in virtually every interview by a police officer of a crime suspect" does not automatically cre-

---

**16.** The court is aware that it has not specifically held a Jackson–Denno hearing regarding Mr. Reynolds's statements. However, it has reviewed the transcript of Deputy Henry's testimony regarding the statements made to him, as well as the information provided in the parties' briefs regarding the statements made to the ATF agents. If counsel for either Mr. Reynolds or the government believe that the court has misunderstood the facts surrounding Mr. Reynolds's statements, the court will be more than happy to hold a Jackson–Denno hearing on the subject. However, counsel should notify the court of his desire for a hearing well in advance of the trial of this case.

ate a custodial situation. *Muegge*, 225 F.3d at 1270.

An interrogation refers "not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (footnote omitted). By contrast, voluntary and spontaneous statements that are not made in response to government questioning are admissible. *Cannady v. Dugger*, 931 F.2d 752, 754 (11th Cir.1991). The inquiry "focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Innis*, 446 U.S. at 301, 100 S.Ct. 1682.

Mr. Reynolds has moved to exclude his incriminating statements on the ground that Deputies Henry and Brown subjected him to custodial interrogation without first informing him of his *Miranda* rights. The court has identified two instances in which Deputy Henry questioned Mr. McCord and Mr. Reynolds before their arrests: Deputy Henry asked both men for the location of the weapon that matched the magazine for an assault rifle, (Henry Tr. 17), and Deputy Henry asked both men who owned the handgun he saw on the arm of the sofa. (*Id.* at 21.) Mr. Reynolds denied knowing anything about the magazine and therefore did not make an incriminating statement in response to Deputy Henry's first question. Mr. Reynolds did admit to owning the handgun found on the arm of the sofa. Mr. Reynolds also argues that his post-arrest statements, made to Alcohol, Tobacco, and Firearms ("ATF") agents, were tainted by his illegal detention at the house, and should be suppressed as well.[17] (Joint Br. in Supp. of Defs.' Mots. to Suppress Evidence 40–42.) Mr. McCord did not make any incriminating statements to the officers during the encounter.

### 1. Pre-arrest Statements

■ A reasonable person, roused by a police officer in the middle of the night, who found himself seated on a couch with one officer standing over him and another searching his house without his permission, would believe he was in custody. Mr. Reynolds was never told that he was free to leave, and indeed he probably wasn't. *Contra United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir.2006). Though the encounter with the police took place on Mr. Reynolds's "turf," Mr. Reynolds could reasonably have believed that he was not free to move around.[18] *Id.* at 1348–49 (citing *United States v. Helmel*, 769 F.2d 1306, 1320 (8th Cir.1985)). Deputy Brown testified that Deputy Henry called out from the back bedroom when he discovered the marijuana in the trash can. Mr. Reynolds was therefore aware from that point on that he was likely to be arrested. *Cf. Moya*, 74 F.3d at 1119 (analyzing whether the suspect was in custody in part

---

**17.** Mr. Reynolds actually rests his Motion to Suppress all statements solely on the argument that he was illegally arrested by Deputies Henry and Brown under *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). (Joint Br. in Supp. of Defs.' Mots. to Suppress Evidence 41.) The court believes analysis of a possible violation of Mr. Reynolds's Fifth Amendment rights is also called for. The court will address Mr. Reynolds's pre-arrest statements under the framework of the Fifth Amendment, and will refer to Mr. Reynolds's *Dunaway* argument for his post-arrest statements.

**18.** Deputy Henry confirmed that, for reasons of officer safety, neither Mr. Reynolds nor Mr. McCord was free to leave at the time of the first sweep through the house, which preceded the statement Mr. Reynolds seeks to suppress. (Henry Tr. 76–77.)

based on whether he had made admissions during police interview that would have led a reasonable person in his place to conclude that he would be arrested immediately).

The purpose of Deputy Henry's question about ownership of the gun was aimed at eliciting incriminating information. Though "general on-the-scene questioning as to facts surrounding a crime" does not count as interrogation for *Miranda* purposes, that rule does not describe the case here. *Garcia v. Singletary*, 13 F.3d 1487, 1489, 1491 (11th Cir.1994) (quotations omitted). Deputy Henry was not responding to a surprising event, *e.g., id.* (characterizing officer's question, "why he set the fire," as a spontaneous reaction to a startling event rather than an interrogation, despite its accusatorial tone), or merely informing Mr. Reynolds of evidence against him, *e.g., United States v. Suarez*, 162 Fed.Appx. 897, 902 (11th Cir.2006) (ruling that officer's statement regarding why he was arresting suspect was not the functional equivalent of interrogation). When Deputy Henry asked the question, he had already swept through a portion of the house and, as discussed above, had no reason to believe there was anyone else in the house. Mr. Reynolds would have known there was no one in the house as well; certainly from his perspective, Deputy Henry's question sought to elicit information regarding ownership of the gun.

Mr. Reynolds's statement was not a voluntary and spontaneous statement. In response to Deputy Henry's question, Mr. Reynolds first denied knowing who the gun belonged to. Then, as Deputy Henry was radioing the serial number, Mr. Reynolds admitted it was his. (Henry Tr. 21.) This admission was clearly in response to Deputy Henry's question and his action in calling in the serial number. Words or actions by the police that are intended to elicit an incriminating response are the

functional equivalent of interrogation. *Innis*, 446 U.S. at 301, 100 S.Ct. 1682. The court therefore concludes that Mr. Reynolds's pre-arrest statement, claiming ownership of the handgun found on the sofa, was obtained in violation of his Fifth Amendment rights. This statement may not be used as evidence against Mr. Reynolds.

2. Post-arrest Statements

■ According to Mr. Reynolds, he was illegally arrested by the officers within the meaning of *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), the moment the officers entered the house. (Joint Br. in Supp. of Defs.' Mots. to Suppress Evidence 41.) The court disagrees. The court previously found that Mr. Reynolds was in custody within the meaning of *Miranda* when he was in the living room. That is not the same as detention that was "in important respects indistinguishable from a traditional arrest." *Dunaway*, 442 U.S. at 212, 99 S.Ct. 2248. The suspect in *Dunaway* was taken to the police station in a police car, placed in an interrogation room, and never informed that he was free to leave—all without probable cause. *Id.* Mr. Reynolds was not handcuffed at the time he claimed ownership of the handgun found on the arm of the sofa, and he was still in his own home. By the time Mr. Reynolds was placed in handcuffs, the police had probable cause to arrest him, based on at least one assault rifle (depending on terminology), other guns, and marijuana discovered throughout the house. The facts of this case are not analogous to *Dunaway*.

■ The court also notes that Mr. Reynolds's later statements to ATF agents are not tainted by the fact that Deputy Henry violated his *Miranda* rights by subjecting him to brief custodial interrogation. In *Oregon v. Elstad*, 470 U.S. 298, 105

S.Ct. 1285, 84 L.Ed.2d 222 (1985), the Supreme Court held that a suspect who answered police questions while in custody without receiving the *Miranda* warnings could still validly waive his *Miranda* rights upon later receiving the warnings. The suspect's post-waiver statements are admissible against him. *See United States v. Gonzalez–Lauzan,* 437 F.3d 1128, 1133 (11th Cir.2006). By contrast, where the police deliberately elicit incriminating statements without giving *Miranda,* then inform the suspect of his rights, and re-elicit the same information immediately thereafter, even post-waiver statements are inadmissible. *Missouri v. Seibert,* 542 U.S. 600, 609–10, 616–17, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). *Elstad* represents a "good-faith *Miranda* mistake," whereas *Seibert* described a "police strategy adapted to undermine the *Miranda* warnings." *Seibert,* 542 U.S. at 615–16, 124 S.Ct. 2601. *Elstad* is the general rule unless *Seibert* applies. *United States v. Street,* 472 F.3d 1298, 1314 (11th Cir.2006).

The decision in *Seibert* was a plurality, with four Justices favoring a five-factor test to determine whether *Elstad* or *Seibert* applied, and one Justice looking to the specific nature of the "two-step strategy" employed by the officers in *Seibert. Gonzalez–Lauzan,* 437 F.3d at 1135–36. All five Justices agreed that the central problem with the *Seibert* two-step technique was that it had the potential to render *Miranda's* message ineffective: "[o]nce a defendant has incriminated himself by answering a series of detailed questions about his involvement in criminal activity . . ., a midstream warning that instructs him of his right to refrain from answering those exact kinds of questions may fail to reasonably convey that he could choose to stop talking." *Id.* at 1136 (citation and quotations omitted).

The court concludes that the *Miranda* warnings could and did function effectively for Mr. Reynolds in this case. *See id.* at 1137. The two interrogations were not continuous. Mr. Reynolds was questioned by different officers, Deputy Henry and the ATF agents, respectively. There is no evidence that the ATF agents used Mr. Reynolds's earlier statement to Deputy Henry to pressure him into incriminating himself again. *See id.* at 1137. Mr. Reynolds was arrested, taken to a different location, given *Miranda* warnings by different officers, representing a different government agency, and questioned. Nothing suggests that the ATF agents' administration of the *Miranda* warnings was ineffective in meaningfully apprising Mr. Reynolds of his rights. Furthermore, all five factors identified by the *Seibert* plurality as guiding the analysis rebut Mr. Reynolds's attempt to bring his case under *Seibert.* Those factors are:

(1) the completeness and detail of the questions and answers in the first round of interrogation, (2) the overlapping content of the two statements, (3) the timing and setting of the first and the second, (4) the continuity of police personnel, and (5) the degree to which the interrogator's questions treated the second round as continuous with the first.

*Id.* at 1135.

To the extent that Deputy Henry's one question could even be termed a "round" of interrogation, it was obviously incomplete and lacking in detail. Deputy Henry asked only about ownership of the handgun he had just found on the sofa. The ATF agents presumably questioned Mr. Reynolds about the same handgun, but as Deputy Henry did not ask any other questions, the court finds the overlap insignificant. The two rounds of questioning were separated by both time and location, and conducted by different police agencies. Finally, there is no evidence to suggest that the ATF agents treated their interro-

gation of Mr. Reynolds as continuous with Deputy Henry's one question. The court concludes that "a reasonable person in the suspect's shoes could have seen the station house questioning as a new and distinct experience." *Seibert,* 542 U.S. at 615–16, 124 S.Ct. 2601. It would not have been reasonable to regard the questions asked by Deputy Henry at the house and the later interrogation by the ATF agents as "parts of a continuum." *Id.* at 617, 124 S.Ct. 2601. Mr. Reynolds's incriminating statements to the ATF agents were obtained after a valid waiver of his *Miranda* rights and are admissible against him.

## IV. *Summary*

For the foregoing reasons, Defendants Dennis McCord's and Willie Reynolds, Jr.'s Motions to Suppress Evidence [Doc. Nos. 16, 31, 32, 42, and 44] are GRANTED IN PART and DENIED IN PART as set forth herein.

All physical evidence found in the house at 2151 Alan Drive, S.W., Atlanta, Georgia, pursuant to the unlawful searches and the search warrant, is excluded from use as evidence against Mr. McCord and Mr. Reynolds, with the following exceptions: the .223 assault rifle magazine found in the living room; the holster found in the living room; the scale found in the living room; the handgun found on the sofa; the assault rifle found under the sofa; and the assault rifle found leaning against the front door to the house.

Mr. Reynolds's Motion to Suppress Statements [Doc. No. 30] is GRANTED IN PART AND DENIED IN PART, also as set forth herein. Mr. Reynolds's statement to Deputy Henry, claiming ownership of the handgun found on the sofa, is excluded from use as evidence against Mr. Reynolds. Mr. Reynolds's later state-

ments to the ATF agents are admissible at trial.

IT IS SO ORDERED.