UNITED STATES of America,

v.

Jerome Julius WEEKS also known as Clarence Royden Weekes also known as Jerome J. Weekes also known as Jerome Week, Defendant.

Criminal File No. 1:08–CR–393–TWT.

United States District Court,
N.D. Georgia,
Atlanta Division.

Oct. 23, 2009.

Ryan Scott Ferber, U.S. Attorney's Office, Atlanta, GA, for United States of America.

Jerome Julius Weeks, pro se.

## ORDER

THOMAS W. THRASH, JR., District Judge.

This is a criminal case. It is before the Court on the Report and Recommendation [Doc. 53] of the Magistrate Judge recommending denying the Defendant's Motion to Suppress Evidence [Doc. 14] and Motion to Dismiss [Doc. 15]. For the reasons set forth in the thorough and well reasoned Report and Recommendation, the law enforcement agents possessed lawful authority to enter the apartment to execute a valid arrest warrant. They had a reasonable belief that the Defendant resided in the apartment and reason to believe that he was within the apartment at the time of entry. The agents then conducted a protective sweep of the premises for their protection and that of others. During the protective sweep, Inspector Warren saw in plain view a box of ammunition in the partially open drawer of the bedroom night stand. After the Defendant was apprehended and removed from the apartment, Ms. Edmonds consented to a search of the apartment. The consent was voluntarily given. Ms. Edmonds' testimony that she did not consent to the search is not credible for the reasons given by the Magistrate Judge. The Defendant concedes that there is abundant Eleventh Circuit authority upholding the constitutionality of 18 U.S.C. § 922(g). The Court approves and adopts the Report and Recommendation of the Magistrate Judge as the judgment of the Court. The Defendant's Motion to Suppress Evidence [Doc. 14] and Motion to Dismiss [Doc. 15] are DENIED.

SO ORDERED, this 22 day of October, 2009.

UNITED STATES OF AMERICA

v.

JEROME JULIUS WEEKS

## ORDER FOR SERVICE OF MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION

RUSSELL G. VINEYARD, United States Magistrate Judge.

Attached is the Final Report and Recommendation of the United States Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1) and N.D. Ga. Cr. R. 58.1(A)(3)(a) and (b). Let the same be filed and a copy, with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Report and Recommendation within ten (10) days of receipt of this Order. Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the Dis-

trict Court. If no objections are filed, the Report and Recommendation may be adopted as the opinion and order of the District Court and any appellate review of factual findings will be limited to a plain error review. *United States v. Slay,* 714 F.2d 1093, 1095 (11th Cir.1983).

Pursuant to Title 18, U.S.C. § 3161(h)(1)(F), **the above-referenced ten (10) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act, whether or not objections are actually filed.** The Clerk is **DIRECTED** to submit the Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED and DIRECTED,** this 21st day of July, 2009.

### MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION

Defendant Jerome Julius Weeks ("Weeks")[1] is charged in a superseding indictment with one count of possessing a firearm after a felony conviction and while on pretrial release, in violation of 18 U.S.C. §§ 922(g)(1), 924(e)(1), and 3147(1), one count of possessing a firearm while being a fugitive from justice and on pretrial release, in violation of 18 U.S.C. §§ 922(g)(2), 924(a)(2), and 3147(1), and two counts of making a false statement in connection with the purchase of a firearm in violation of 18 U.S.C. § 924(a)(1)(A). [Doc. 24].[2] Weeks has filed a motion to suppress evidence from a warrantless search, [Doc. 14], and a motion to dismiss the first two counts, [Doc. 15], contending that § 922(g) is unconstitutional. Following an evidentiary hearing on the motion to suppress,[3] the parties filed post-hearing briefs, [Docs. 39, 48, & 52], and the motions are now ripe for review. For the following reasons, the undersigned **RECOMMENDS** that Weeks' motion to suppress, [Doc. 14], and motion to dismiss, [Doc. 15], be **DENIED.**

### I. STATEMENT OF FACTS

On September 21, 2006, Weeks was convicted in the United States District Court for the District of Massachusetts of one count of possession of a firearm after a felony conviction, in violation of 18 U.S.C. § 922(g)(1). [Doc. 39 at 3–4; Doc. 48 at 3]. Weeks was allowed to remain on bond pending sentencing, but he failed to appear at his sentencing hearing on January 31, 2007. [Doc. 39 at 4]. The District Court in Massachusetts issued a warrant for his arrest, and the Boston U.S. Marshals Service ("USMS") began a fugitive search for Weeks. [*Id.*]. In March 2007, the Boston USMS received a tip from the mother of Debra Edmonds ("Edmonds"), Weeks' girlfriend, that Weeks, Edmonds, and her two daughters[4] were staying at an apartment at 415 Fairburn Road, Atlanta, Georgia. (Tr. at 85, 110, 132). The address provided was an apartment complex. (Tr. at 85).

Upon receiving the tip that Weeks was in Atlanta, the Boston USMS referred the

---

1. a/k/a Clarence Royden Weekes, Jerome J. Weekes, and Jerome Week, [*see* Doc. 24].

2. The superseding indictment also contains a forfeiture provision pursuant to 18 U.S.C. § 924(d) and 28 U.S.C. § 2461. [Doc. 24 at 8].

3. *See* Docs. 34 and 35 for the transcript of the evidentiary hearing, held on February 23, 2009, and March 4, 2009. Citations to the

evidentiary hearing transcript hereinafter will be referred to as "(Tr. at _____)." In addition, the parties submitted exhibits at the hearing, which will be referred to as "(Gov. Ex. _____)" for the government's exhibits and "(Def. Ex. _____)" for Weeks' exhibits.

4. Edmonds' older daughter was approximately seven years old, and her younger daughter, who was three months old, was Weeks' child. (Tr. at 14, 196; Gov. Ex. 7).

fugitive investigation to the USMS Southeast Regional Fugitive Task Force ("SERFTF"), in Atlanta. Deputy United States Marshal Wendell Brock ("Deputy Brock") was assigned to the investigation, and he began conducting computer database searches for Weeks, but could not locate any information on Weeks in Georgia, so he performed searches using Edmonds' name. (Tr. at 86, 107). Deputy Brock contacted Georgia Power and learned that Edmonds was connected to apartment 1005 at 415 Fairburn Road. (Tr. at 85, 87).[5] Deputy Brock could not recall whether the utility bill for apartment 1005 was in Edmonds' name or in the name of the person who actually leased apartment 1005, Latasha Woods ("Woods"), (Tr. at 107–08),[6] but he believed that he connected Edmonds to the apartment through Georgia Power after he "called somebody and had somebody else speak with somebody" about the utility bill. (Tr. at 108).[7]

Deputy Brock conducted surveillance of apartment 1005 on at least two days and observed Weeks coming and going from the apartment on those occasions. (Tr. at 109–10).[8] On April 20, 2007, one of the days Deputy Brock was surveilling apartment 1005, he observed Weeks enter the apartment, and Deputy Brock called for backup to assemble an arrest team, but before the team could arrive, Weeks exited the apartment and Deputy Brock lost sight of him. (Tr. at 85–86, 88–89). After Deputy Brock did not see Weeks return within approximately one hour, he called off the arrest. (*Id.*).

On April 26, 2007, Deputy Brock assembled an arrest team of approximately 8 to 9 agents who met for a briefing between 6:00 and 6:30 a.m. at a medical facility approximately one-fourth of a mile from the apartment complex. (Tr. at 8, 89–91). Most of the agents were in plain clothes, but they all wore bulletproof vests that had "U.S. Marshals" printed on the front and "Police" or "Police Southeast Fugitive Task Force" on the back. (Tr. at 90). No one was wearing a helmet or goggles, but each member of the arrest team had a firearm. (*Id.*). Deputy Brock went over Weeks' criminal history, the nature of the charges against Weeks in Boston, a physical description of Weeks' height and weight, the location of the apartment and its description, and showed the agents Weeks' photograph. (Tr. at 91).

The arrest team then proceeded to the apartment complex at 415 Fairburn Road. Apartment 1005 was at the front of the building on the second floor, facing the parking lot and located to the left of the stairs that led from the parking lot to the front of the apartment through an open-air breezeway. (Tr. at 9–10, 92, 131; Gov. Ex. 6). At least four agents were on the perimeter team that stayed on the ground. (Tr. at 92). There was a window at the corner of the apartment, so the perimeter agents watched the corner window and the front of the apartment. (Tr. at 10, 92; Def. Ex. 8). The rest of the agents, who were on the entry team, approached the

---

**5.** He also searched Edmonds' name on Auto Track, a search database, and found that she was associated with a different apartment at 415 Fairburn Road. (Tr. at 107, 109).

**6.** Woods was another female companion of Weeks who was pregnant with Weeks' child. (Tr. at 217). The Georgia Power records for February 1, 2007, to May 1, 2007, indicate that the utilities were in Woods' name during this time period. (Def. Ex. 10).

**7.** Deputy Brock could not recall whether he spoke directly with someone at Georgia Power or requested the information through an analyst or some other person. (Tr. at 108).

**8.** Deputy Brock testified that "someone" also "said [Weeks] was coming and going out of that apartment." (Tr. at 110–11). Deputy Brock never traced a vehicle to Weeks, but he saw Weeks driving "two or three different cars with drive-out tags." (Tr. at 111).

apartment in a single-file line, commonly referred to as a "stack." (Tr. at 10, 92).

The first agent in the stack, SERFTF Special Agent Joel Sheppard ("Agent Sheppard"), knocked on the door and yelled "Police," but no one answered. (Tr. at 92–93, 249). He knocked several more times. (Tr. at 92, 249). Edmonds, who was sleeping in the master bedroom, located on the front left side of the apartment, was awakened by the knocking. (Tr. at 193). She nudged Weeks and told him to go open the door, but he did not wake up. (*Id.*). Edmonds detected a light at the window and she peeked through the blinds. (*Id.*). She saw agents and cars in the driveway of the parking lot, and one of the agents was flashing a light into the bedroom window. (Tr. at 193–94). Edmonds testified that she "[g]ot scared and tried to wake [Weeks], shaking him and telling him to get up." (Tr. at 195). Weeks then woke up, got out of bed, and ran to the back of the bedroom toward the closet and the bathroom. (*Id.*). Edmonds testified that she opened the bedroom door and "attempted to go get the kids." (*Id.*).

USMS Inspector Alexis Camacho ("Inspector Camacho"), one of the perimeter agents, noticed that someone had come to the corner window and looked out through the blinds. (Tr. at 249). He and other agents on the perimeter notified the entry team that someone had just peeked out of the window, and they yelled "go to the front door, go answer the door, police, go to the door." (Tr. at 92–93, 249–50). However, since no one had come to the door after several knocks and officers had spotted someone at the window of the apartment, Deputy Brock, who was fourth

in the stack, ran back downstairs to his vehicle, obtained a battering ram, ran back upstairs, and gave the ram to Investigator Tony Smith, who used it to forcibly enter the apartment. (Tr. at 93–94).

When the officers entered the apartment, they first encountered Edmonds and her two children; the children were crying. (Tr. at 95). The officers asked her where Weeks was, and according to Deputy Brock, Edmonds, who was "pretty hysterical," started saying "he wouldn't let me come to the door, he wouldn't let me answer the door," and she nodded her head toward the bedroom in response to the officers' questions about where Weeks was located. (*Id.*).[9] Deputy Brock testified that the officers asked her why she did not open the door and why she was "putting [her] children through this." (*Id.*). Deputy Brock's firearm was out at this time, but it was not pointed at Edmonds. (*Id.*). Other members of the entry team initially had their weapons pointed at Edmonds as they entered since they did not know who she was, but when they realized the individuals in the living room area were Edmonds and her children, they turned their weapons away from her. (Tr. at 23, 27, 140, 142). The agents told Edmonds to stay calm and move out of the way so they could search for Weeks. (Tr. at 139–40). She was never handcuffed, but the agents seated her on the couch with her children. (Tr. at 15, 39, 147, 233). A female agent, Deputy Leslie Smith, stayed with Edmonds for officer safety reasons. (Tr. at 17, 106, 198).

The officers then fanned out through the apartment in order to locate Weeks. (Tr.

---

9. Edmonds testified that when she opened the bedroom door, "there was [sic] agents coming in the house and the children were coming toward me." (Tr. at 195). She had heard the agents break the door down, and when she came out into the living room she saw "lights and guns in my face." (Tr. at 196). Edmonds also denies telling the agents that Weeks had prevented her from answering the door, or that she nodded her head toward the bedroom in response to their question about where Weeks could be located. (Tr. at 197, 234).

at 95–96). Several officers watched the kitchen area, which was to the right of the living room, and Deputy Brock, Inspector Wayne Warren ("Inspector Warren"), and SERFTF Task Force Agent Thomas Munson ("Agent Munson") proceeded into the master bedroom. (Tr. at 95–96, 112). Deputy Brock positioned himself at the closet as Inspector Warren went to the left and continued the sweep of the room. (Tr. at 114, 141).[10]

Inspector Warren testified that "a lot of people will try to hide either in between mattresses, underneath the bed or behind the bed or behind the headboards," so he "immediately went to the left side, began to check the bed area." (Tr. at 141).[11] He looked over the top of the bed to see if there was a "gap or anything between the headboard and the mattresses to the wall." (Tr. at 162). At that point, Inspector Warren saw that a drawer in the night stand to the left of the bed was open, and he noticed a green box and "could tell there was

something there." (Tr. at 96, 141, 163). Inspector Warren then knelt down to look under the bed with the flashlight on his long gun, quickly lifted the mattress, and "actually tried to look to make sure between the headboard and the bed itself there's nobody there." (Tr. at 162).[12] As he stood up and turned to go toward the other agents at the closet, he saw a box of ammunition in the partially open drawer of the night stand. (Tr. at 145, 149–50, 163; Def. Ex. 3).[13] Inspector Warren immediately yelled to let the other agents know that he had seen the ammunition in order to "heighten[ ] [the agents'] awareness of possibly there could be a firearm within the residence or somebody could have a firearm on them inside the residence." (Tr. at 141, 163). Inspector Warren testified that he did not open the drawer further when he spotted the box because he was "in the middle of doing a search for the body at that time." (Tr. at 145, 150). Inspector Warren noticed the ammunition

---

**10.** Deputy Brock and Inspector Warren testified that Agent Sheppard went into the bedroom and proceeded to the closet with the shield, but Agent Sheppard testified that he was not in the bedroom when the agents found Weeks and that Deputy Brock, Inspector Warren, and Agent Munson had been in the bedroom. (Tr. at 16, 39–40, 141). Inspector Warren did not recall Deputy Brock being in the room but did remember Agent Munson in the bedroom. (Tr. at 141). Deputy Brock later testified that at least he, Agent Munson, and Inspector Warren approached the closet door to look for Weeks. (Tr. at 114).

**11.** Inspector Warren testified that he has been employed by the USMS for more than ten years and has participated in "[w]ell over a thousand" fugitive investigations. (Tr. at 134–35).

**12.** Inspector Warren explained that he lifted the mattress up because he has found fugitives hidden between mattresses and underneath them, behind headboards, behind furniture, and in general, "everywhere." (Tr. at 150). He also testified that he was "looking

everywhere to make sure [Weeks was] not behind that nightstand." (Tr. at 163). He explained, "All that area even though you might be able to see it, I'm telling you in our line of work we've found people hiding-you couldn't imagine where these people hide." (Tr. at 163–64).

**13.** Weeks and Edmonds deny that the night stand drawer was open. Specifically, Edmonds testified that she had cleaned the master bedroom the prior evening, dusted both night stands, and did not open the drawers. (Tr. at 209–10). Weeks testified that he had gone out to a club the night before and returned around 3:30 a.m. (Tr. at 262–65). After he came home, he got a glass of juice from the kitchen, went to the bedroom, and placed the glass on the left night stand. (Tr. at 268–69). He stated that the drawer of the night stand was not open and he did not open it. (Tr. at 268–70). He further testified that the drawer, which contained a box of ammunition, was never left open because of the two small children in the apartment. (Tr. at 289).

before Weeks had been located. (Tr. at 15, 55–56, 97, 114–15, 141–42, 169).

Deputy Brock testified that out of the corner of his eye, he saw that the night stand drawer was open and that Inspector Warren noticed a box of bullets in the drawer "almost immediately" as he was walking by the night stand, and "may have stopped and looked down" when he saw the bullets. (Tr. at 115, 120–22).[14] Deputy Brock remembered Inspector Warren calling out "bullets" or "ammunition." (Tr. at 96, 115).[15] Deputy Brock did not see or hear anyone opening drawers while they were in the bedroom searching for Weeks. (Tr. at 122). Deputy Brock's "alert senses were heightened that we knew he was hiding somewhere and we had found a box of bullets and knowing his criminal history put [him] on more heightened alert." (Tr. at 96–97).[16] Agent Sheppard also heard "somebody in the bedroom saying rounds of ammunition," and the agents "immediately thought that [Weeks] was going to be hiding with a gun," since he had not yet been located. (Tr. at 15, 56). While the agents were searching for Weeks, their weapons were still drawn. (Tr. at 16).

After the rest of the bedroom had been checked, Inspector Warren walked toward the closet, and he, Deputy Brock, and Agent Munson approached it. (Tr. at 114, 116–17, 152). Agent Munson or Inspector Warren opened the closet door, and the agents found Weeks on his knees in the closet. (Tr. at 116–17, 142, 308, 310). Weeks had on a tank top and a pair of boxer shorts. (Tr. at 98–99, 143, 200; Def. Ex. 1). The agents gave Weeks several verbal commands to get down on the ground and eventually reached in and removed him from the closet. The agents laid Weeks down on his stomach with his arms stretched out, patted him down to make sure he did not have a weapon, and handcuffed him. (Tr. at 97–99, 117, 142–43, 310–11). At this time, approximately two to three minutes had elapsed between the agents' initial entry into the apartment and their locating Weeks in the closet. (Tr. at 25, 119).

Deputy Brock and Agent Munson escorted Weeks out of the bedroom, through the living room in front of Edmonds and her children, out the front door of the apartment, and into the open-air breezeway. (Tr. at 16, 18, 64, 99–100, 117–19, 200–01, 308, 312, 315).[17] Weeks and Edmonds had no communication with each other as Weeks was led out of the apartment. (Tr. at 100, 200, 275–76). The agents completed their security sweep while Weeks was in the breezeway, including a two-minute secondary search "to make sure nobody is hiding under the bed or hiding somewhere where [the agents] might have missed a body." (Tr. at 24–25, 58). After the agents determined that the

14. Agent Sheppard wrote in his report and testified before the grand jury that Inspector Warren had also seen a holster in plain view in the night stand. (Tr. at 53–54, 126–27, 169). Deputy Brock also included in his report that the holster was found in plain view. (Tr. at 126). However, on the day of the suppression hearing, Inspector Warren read Agent Sheppard's report and told Agent Sheppard that he had only observed the ammunition in plain view. (Tr. at 53–54). Thus, Agent Sheppard testified at the suppression hearing that he had been mistaken in his report and prior testimony. (*Id.*).

15. The agents illuminated the bedroom either by their flashlights or by turning on the lights in the room. (Tr. at 115).

16. Deputy Brock knew Weeks was wanted on weapons charges and that his criminal history included charges for attempted armed robbery, assault and battery, and resisting law enforcement. (Tr. at 97).

17. Agent Sheppard testified that Edmonds was "just calm, just sitting there" on the couch as Weeks was secured and taken outside, but Deputy Brock testified that he believed she was crying. (Tr. at 18, 100).

only people left were Edmonds and her children, they re-holstered their weapons for the remainder of the time and relayed the "clear" signal to the rest of the team. (Tr. at 23–24, 99–100, 171).

Weeks sat handcuffed in the breezeway until the agents removed the handcuffs to secure him with a "belly chain, waist chain and cuffs" and leg irons before transporting him. (Tr. at 99, 102, 314–15; Gov. Ex. 6; Def. Exs. 8–9). Deputy Brock did not remember Weeks saying anything except that his name was "Jay," although Weeks might have also asked for clothing. (Tr. at 102, 118–19).[18] Neither Deputy Brock nor Agent Munson, who also escorted him outside, remembered Weeks saying that the agents could not search his bedroom or asking if they had a search warrant. (Tr. at 118–19, 315).[19] Deputy Brock stayed outside with Weeks for the most part until he was transported from the scene, and if Deputy Brock had to go back inside, someone else stayed with Weeks at all times. (Tr. at 100–01).[20]

After the agents completed the sweep, approximately five minutes after the initial entry, Agent Sheppard and Inspector Warren approached Edmonds, who was still seated on the couch with her two children. (Tr. at 19, 24, 29–30, 57, 147, 170–71). Agent Sheppard asked her if there was anything in the apartment that would hurt the agents, "any bombs, grenades, anything of that nature," to which Edmonds replied "no, there wasn't anything in the house like that." (Tr. at 19, 59). Edmonds had a "regular calm demeanor," and Inspector Warren and Agent Sheppard explained to her why they were there and "what was going on." (Tr. at 146–47). Agent Sheppard testified that he then asked if they could search, "and she said she didn't have a problem with it or she just said yes." (Tr. at 19).[21] The agents did not make any threats or promises to induce Edmonds to consent, never raised their voices, yelled, or physically touched her, never restrained her in any way, never told her that she was under arrest, and never told her that if she refused, a search warrant could or would be obtained. (Tr. at 28–29, 69, 79–80, 148, 177).

After obtaining Edmonds' verbal consent, agents began searching the apartment for any firearms or ammunition associated with the ammunition they had already observed in plain view. (Tr. at 23, 28, 145–46, 168). Edmonds remained

---

18. Weeks testified that before he was taken outside of the bedroom and once again on the breezeway, he asked if he could put some clothes on but that the agents told him no because he was not cooperating. (Tr. at 275, 277). He stated that he had to "go in front of the judge with my boxers and my tank top." (Tr. at 278). He also testified that he was given a pair of sneakers outside the apartment before being taken to a vehicle for transport. (Id.). However, Agent Sheppard testified that the agents found two forms of identification in Weeks' wallet that was "in his pants pocket ... that he put on to be transported." (Tr. at 20). Deputy Brock also testified that he believed the agents brought sweat pants and shoes for Weeks to put on in the breezeway and that they had to take the leg irons off of him so he could put the pants and shoes on. (Tr. at 104, 130).

19. Weeks testified that as he was led out of the bedroom, he saw agents looking through the drawers of the night stands, and he asked if the agents had a search warrant and yelled, "You can't search." (Tr. at 274–75). He stated that an agent responded, "Take him outside." (Id.).

20. Deputy Brock did not question Weeks further after inquiring about his name and did not read him his *Miranda* rights. (Tr. at 102); *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

21. Edmonds, however, testified that she never verbally consented because it was "not [her] home." (Tr. at 202, 208, 234–35).

seated on the couch in the living room while the agents conducted the search of the apartment. (Tr. at 28, 151). During the search, which lasted approximately 15 to 25 minutes, agents seized the ammunition Inspector Warren had observed in the night stand drawer, an empty firearms holster from that same night stand drawer, a loaded Ruger handgun and a loaded Taurus 9mm handgun located in unlocked cases, a driver's license and credit cards bearing the name "Clarence Weekes" and Weeks' photograph from a wallet located in the pocket of a pair of pants, miscellaneous documents, including a birth certificate bearing the name "Clarence Marcel Weekes," $1,300.00 located in a lock box, and a stack of dealer license plate tags in plain view on the kitchen table. (Tr. at 19–23, 28, 34–36, 60–63, 65, 77–79, 145, 150–51; Gov. Exs. 2E, 2G, 2H, 21, & 2J; Def. Ex. 1). As agents were conducting the search, Deputy Brock, who was standing with Weeks in the breezeway outside of the apartment, could hear one of the agents yell that firearms had been found. (Tr. at 100–01, 120). Weeks heard this as well but did not communicate to Edmonds or the agents to stop the search. (Tr. at 276–77, 297).

During the search, Agent Sheppard commented that he wished he had a written consent to search form to present to Edmonds, and Inspector Warren advised him that he had a form in his vehicle. (Tr. at 30–31, 66, 152–53, 173–74). Inspector Warren retrieved the form, returned to the apartment, sat down on the couch with Edmonds, read the form to her, and explained that the purpose of the form was to verify the verbal consent to search she had already given the agents. (Tr. at 31–32, 66, 152–55, 175–76; Gov. Ex. 3). Edmonds was calm during this conversation. (Tr. at 154–55). Agent Sheppard, who was present during this conversation, described the items that had already been found in the apartment to Edmonds. (Tr. at 69). Inspector Warren then completed the form in Edmonds' presence and asked her to sign it, but Edmonds refused to sign the consent form because she did not feel comfortable signing it. (Tr. at 31–33, 66–69, 72, 153–54, 176–79; Gov. Ex. 3).[22] Therefore, Inspector Warren wrote "refused to sign" on the signature line and "gave verbal consent" underneath the signature line, and asked Edmonds to initial by those comments to confirm her verbal consent, which she did. (Tr. at 31–33, 67–68, 71–74, 79–80, 127–28, 154, 177; Gov. Ex. 3).[23] Deputy Brock was also present in the room at this time and overheard Agent Sheppard and Inspector Warren's conversation with Edmonds, and Edmonds statement that she did not want to sign the consent form but would initial that she gave verbal consent. (Tr. at 127–28). After this conversation, the agents did not conduct any further search of the apartment. (Tr. at 33–34, 66, 155, 179).

## II. DISCUSSION

### A. *Weeks' Motion to Suppress Evidence, [Doc. 14]*

Weeks contends that all the evidence recovered from the apartment should be suppressed because the initial entry and subsequent search were illegal. [Doc. 48].

---

**22.** Edmonds testified that the agents were yelling at her and threatening her to try to get her to sign the consent form. (Tr. at 201–06, 235). She claims that the agents even offered to give her the $1,300.00 they recovered from the lock box as an incentive to sign the form. (*Id.*).

**23.** Edmonds testified that when she initialed the consent form, it only contained the "refused to sign" comment on it, suggesting that the agents added the "gave verbal consent" after she had already initialed the form. (Tr. at 203–04, 207–08, 237–39; Gov. Ex. 3).

Weeks presents several arguments regarding the entry and warrantless search which the Court will now address.

### 1. *Initial Entry*

■ The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The principle intrusion against which the Fourth Amendment is aimed is physical entry into one's home. *Payton v. New York*, 445 U.S. 573, 585, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (citation and quotations omitted). However, when law enforcement agents are armed with a valid arrest warrant, i.e., an arrest warrant founded upon probable cause,[24] they possess the "limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Id.* at 603, 100 S.Ct. 1371.

■ In assessing whether law enforcement agents possessed lawful authority to enter a residence pursuant to a valid arrest warrant, courts inquire into two matters: first, whether there existed a reasonable belief that the location to be searched was the suspect's dwelling; and second, whether the agents had "reason to believe" that the suspect was within the dwelling at the time of entry. *United States v. Bervaldi*, 226 F.3d 1256, 1263 (11th Cir.2000); *United States v. Magluta*, 44 F.3d 1530, 1533 (11th Cir.1995). All facts and circumstances within the knowledge of the law enforcement agents are relevant to this analysis and are viewed in their totality, and common sense factors guide the analysis. *Bervaldi*, 226 F.3d at 1263; *Magluta*, 44 F.3d at 1535.

Weeks contends that the government has not met its burden under *Payton* to justify the warrantless entry into the apartment to execute the arrest warrant. Specifically, Weeks argues that there was no basis to believe that the apartment was his residence or that he would be there on the morning the agents made entry, and he maintains that "[t]he unlawful entry taints everything." [Doc. 48 at 17]. He maintains that Deputy Brock conducted a "deficient investigation leading up to the raid" and complains about various alleged shortcomings, including that Deputy Brock never interviewed the apartment manager to determine who was on the lease, never conducted a search of Department of Motor Vehicles records to learn whether a car was registered to that address or whether a Georgia driver's license or identification card had been obtained in Weeks' name, and never connected the car Weeks was seen driving to the apartment. [Doc. 48 at 20–22].[25] Weeks also contends that Deputy Brock's surveillance was inconclusive to establish that he was actually residing at apartment 1005. [*Id.*].

Weeks cites *Bervaldi*, 226 F.3d at 1258 and *United States v. Bennett*, 555 F.3d 962 (11th Cir.2009), to support his contention that the investigation was insufficient to conclude that he was residing at apartment 1005. [Doc. 48 at 17–19]. In *Bervaldi*, officers attempted to execute an arrest warrant for Deridder at Bervaldi's residence. 226 F.3d at 1258. The officers knocked on Bervaldi's door for about ten minutes when someone opened the door approximately a foot wide, and when the officers identified themselves and noticed that the person who answered had the same physique as Deridder, the officers

---

**24.** Weeks does not dispute the validity of the arrest warrant.

**25.** Deputy Brock testified that he conducted computer database searches for Weeks and

found no information for him in Georgia, (Tr. at 85–86), and the cars he observed Weeks driving had drive-out tags, (Tr. at 111), so Deputy Brock was unable to pursue some of the investigative steps suggested by Weeks.

kicked in the door. *Id.* Though Deridder was not located inside, the officers did detect the smell of marijuana as they conducted a protective sweep of the premises. Bervaldi sought to suppress evidence recovered from a search of the residence, arguing that the officers did not have a reasonable belief that Deridder resided at his residence. *Id.* at 1259, 1262. The district court granted Bervaldi's motion, but on appeal, the Eleventh Circuit reversed, finding that the police officers' six-month investigation into the location of the suspect to be arrested, including checking the registration of the suspect's vehicle which showed the vehicle registered to Bervaldi's residence, running a computer check on the suspect's business which revealed that it was registered to Bervaldi's residence, observing Deridder leaving the residence during surveillance, noting Deridder's response to informal questioning that he lived at Bervaldi's residence, and observing his car in front of the house at the time they entered, was sufficient to believe that Deridder resided there and was inside the house at the time the officers attempted to execute the warrant. *Id.* at 1260, 1263–64.

Similarly, in *Bennett*, the Eleventh Circuit affirmed the district court's finding that the agents' belief that defendant was residing in his mother's apartment was not unreasonable based on the totality of the circumstances where the agents' investigation showed that defendant had recently paid rent for the apartment to the land-lord, that the landlord had spoken to defendant when he answered the apartment door during the landlord's follow-up on a noise complaint, and that defendant's mother had told the landlord that he was "in and out" of her apartment because the two of them were starting a cleaning business together. 555 F.3d at 965. While the officers in *Bervaldi* and *Bennett* had more direct evidence regarding the arrestee's residence than the agents did here, these cases do not establish a requisite level of proof necessary to satisfy the *Payton* standard. Rather, the Court must make a common sense assessment of the facts known to the law enforcement agents in this case and determine whether they had "reason to believe" Weeks was residing at apartment 1005.[26]

■ A warrant was issued for Weeks' arrest by the United States District Court for the District of Massachusetts after he failed to appear in court on January 31, 2007, for sentencing following his conviction for possession of a firearm by a convicted felon. The Boston USMS received a tip from Edmonds' mother that Weeks was living with Edmonds and her two daughters at an apartment at 415 Fairburn Road, Atlanta, Georgia. (Tr. at 85, 110, 132). In March 2007, Deputy Brock was assigned the fugitive investigation in Atlanta, and he developed information from an inquiry with Georgia Power that connected Edmonds to apartment 1005. (Tr. at 85, 87, 107–09). Thereafter, Deputy Brock conducted surveillance of apart-

---

**26.** The Eleventh Circuit has held that "reasonable belief is different than probable cause," *Bervaldi*, 226 F.3d at 1265 (*citing Magluta*, 44 F.3d at 1534–35), and several other circuits have reached a similar conclusion. *See United States v. Thomas*, 429 F.3d 282, 286 (D.C.Cir.2005); *Valdez v. McPheters*, 172 F.3d 1220, 1225–26 (10th Cir.1999); *United States v. Route*, 104 F.3d 59, 62 (5th Cir.1997); *United States v. Risse*, 83 F.3d 212, 216 (8th Cir.1996); *United States v. Lauter*, 57 F.3d 212, 215 (2d Cir.1995). However, the Ninth Circuit and the Sixth Circuit, in dicta, have equated the reasonable belief standard to probable cause. *United States v. Hardin*, 539 F.3d 404, 416 n. 6 (6th Cir.2008); *United States v. Gorman*, 314 F.3d 1105, 1110 (9th Cir.2002). The Court is bound to follow Eleventh Circuit precedent and will apply the "reason to believe" standard consistent with that precedent.

ment 1005, and he saw Weeks coming and going from the apartment on at least two occasions, including six days before the arrest was made. (Tr. at 109–10). When the agents knocked on the door of apartment 1005 and announced their presence, someone peeked out of the window, but no one came to the door. (Tr. at 92–93).

The tip from Edmonds' mother, coupled with the information from Georgia Power,[27] led Deputy Brock to focus his attention on apartment 1005, and his surveillance established that Weeks was entering and leaving the apartment and driving "two or three different cars with drive-out tags." (Tr. at 109–11). The agents were entitled to consider that Weeks, a fugitive from justice, "might have been concealing his presence." *Magluta*, 44 F.3d at 1538. Thus, when the agents knocked and announced their presence at the apartment, and someone peeked out the window but did not open the door, it provided further reason to believe that Weeks was hiding inside. *See United States v. Beck*, 729 F.2d 1329, 1332 (11th Cir.1984) ("The fact that no one responded to [the] knock and announcement did not mean that no one was home since it was reasonable to expect a fugitive to hide or flee if possible.").

■ While Weeks points out other investigative steps that could have been taken to verify that he was residing in apartment 1005, law enforcement agents are not required to establish with certainty that a suspect is residing at a residence to lawfully enter it to execute an arrest warrant, only that there is reason to believe that he

is dwelling there. *See Magluta*, 44 F.3d at 1538 ("Neither *Payton* nor this court's Fourth Amendment jurisprudence requires law enforcement officers to be absolutely certain that a suspect is at home before entering a residence to execute an arrest warrant."); *United States v. Terry*, 702 F.2d 299, 319 (2d Cir.1983) ("We have rejected the contention that the police must first conduct a thorough investigation to obtain evidence of an arrestee's actual presence before entering his residence."). Indeed, the police need not possess "rock-solid indicators of residence in order to form a reasonable belief that a suspect resides at a given place." *United States v. Graham*, 553 F.3d 6, 13 (1st Cir.2009) (internal marks omitted).

Here, the totality of the information the agents had before entering the apartment, as discussed herein, provided them reason to believe that Weeks was residing at apartment 1005. *See Magluta*, 44 F.3d at 1537 (tip from third-party suggested defendant lived at particular location); *United States v. Veal*, 453 F.3d 164, 168 (3d Cir.2006) (officers followed a lead that defendant was residing with a woman, learned they were married, and observed a car registered to her that he was known to drive parked near residence); *Thomas*, 429 F.3d at 286 ("Although the Government's evidence was succinct, to say the least, the word 'investigation,' even without details, denotes something at least akin to, as the Government puts it, 'a systematic official inquiry', and in any event more than a mere hunch, surmise, or suspi-

---

**27.** Weeks contends that the Georgia Power statement he submitted at the evidentiary hearing establishes that Woods, not Edmonds, was the account holder for apartment 1005 during the period of Deputy Brock's investigation. [Doc. 48 at 23]. However, Deputy Brock testified that he was not certain that the Georgia Power bill was in Edmonds' name, only that information received from an inquiry with Georgia Power connected Ed-

monds to apartment 1005. Regardless of whose name was on the account, Deputy Brock testified that his attention became focused on apartment 1005 as a result of information he received from an inquiry with Georgia Power, and his subsequent surveillance of Weeks entering and leaving the apartment gave him reason to believe Weeks was residing at the apartment with Edmonds as her mother had told the Boston USMS.

cion."); *Lauter*, 57 F.3d at 215 (reliable informant told police defendant had moved into basement apartment); *Solis–Alarcon v. United States*, 514 F.Supp.2d 185, 193, 197–98 (D.P.R.2007) (agents who conducted search reasonably relied on information passed on by other agents who, after surveillance of suspect driving vehicle and parking it at location of search, believed suspect to reside at residence searched).

 The agents likewise had reason to believe that Weeks would be inside the apartment on the morning of his arrest. "[O]fficers may presume that a person is at home at certain times of the day—a presumption which can be rebutted by contrary evidence regarding the suspect's known schedule." *Magluta*, 44 F.3d at 1535. The agents entered the apartment early in the morning, around 6:30 a.m., a time when the Eleventh Circuit has held the presumption to apply, and, based on their investigation, the agents had not been able to verify any employment for Weeks. (Tr. at 86); *United States v. Jean*, 315 Fed.Appx. 907, 911 (11th Cir. 2009) (unpublished); *Bervaldi*, 226 F.3d at 1267. *See also United States v. Woods*, 560 F.2d 660, 665 (5th Cir.1977)[28] (reason-able to believe suspect would be "at his place of abode, especially at 8:30 in the morning for a man not known to be working"). Weeks has not rebutted this presumption. Accordingly, the agents' entry into the apartment was lawful.[29]

### 2. *The Search for Weeks*

 Weeks argues that even if the agents lawfully entered the apartment to execute the arrest warrant, Inspector Warren conducted an unlawful search of the bedroom, including opening the night stand drawer where the ammunition was found, without consent or a warrant. [Doc. 48 at 33]. "It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable ... subject only to a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (citations omitted). A warrantless "protective sweep" of the apartment, upon entry to execute an arrest warrant, however, is allowed in circumstances such as those presented here. *See Maryland v. Buie*, 494 U.S. 325, 334, 110

---

**28.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

**29.** Weeks, relying on *Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981), also contends that the agents' forced entry into the apartment, which was actually leased by Woods, was improper because it was without a search warrant or sufficient exigent circumstances. [Doc. 48 at 24 n. 8, 25–28]. "In *Steagald*, the Supreme Court held that a search warrant was required to enter one person's residence to execute an arrest warrant on another person believed to be in that residence." *Bervaldi*, 226 F.3d at 1267 n. 11. However, "'*Steagald* does not prevent police entry if the arresting officers executing the arrest warrant at the third per-son's home have a reasonable belief that the suspect resides at the place to be entered and have reason to believe that the suspect is present at the time the warrant is executed.'" *United States v. Reinhart*, No. CR08–0015, 2008 WL 4180295, at *4 (N.D.Iowa Apr. 8, 2008) (*quoting United States v. Powell*, 379 F.3d 520, 523 (8th Cir.2004) (citation omitted)). Therefore, because the agents had a "reasonable belief that the suspect lived at the apartment where the arrest warrant was executed, a search warrant was not necessary." *United States v. Rios*, Criminal No. 06–019(JAG), 2007 WL 509868, at *2 (D.P.R. Feb. 13, 2007). *See also United States v. Barrera*, 464 F.3d 496, 504 (5th Cir.2006) (distinguishing *Steagald* because officers had reason to believe that defendant resided and was within the residence where evidence did not support belief that defendant was a mere guest).

S.Ct. 1093, 108 L.Ed.2d 276 (1990); *United States v. Delgado,* 903 F.2d 1495, 1502 (11th Cir.1990) (*citing Buie,* 494 U.S. at 334, 110 S.Ct. 1093); *Magluta,* 44 F.3d at 1538 (same).

 "[A]s an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be launched." *Buie,* 494 U.S. at 334, 110 S.Ct. 1093. " 'A protective sweep is a quick and limited search of a premise, incident to an arrest and conducted to protect the safety of police officers and others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding.' " *United States v. Rigsby,* 943 F.2d 631, 637 (6th Cir.1991) (*quoting Buie,* 494 U.S. at 327, 110 S.Ct. 1093). Weeks argues, however, that Inspector Warren exceeded the proper scope of a protective sweep because he did not confine his search to "a cursory inspection of those spaces where a person may be found," *Buie,* 494 U.S. at 335, 110 S.Ct. 1093, but instead searched areas in the bedroom, including the night stand, where a person could not be expected to hide. Weeks' argument comes down to a credibility assessment of the testimony presented at the evidentiary hearing, and the credible testimony indicates that the agents limited their search to areas where a person could hide.

After the agents entered the apartment, Edmonds motioned that Weeks was in the master bedroom. (Tr. at 95, 140, 149–50, 160–65). Therefore, Deputy Brock, Inspector Warren, and Agent Munson proceeded to the master bedroom. (Tr. at 95–96, 112). Inspector Warren, who has participated in over a thousand fugitive investigations, testified that "a lot of people will try to hide either in between mattresses, underneath the bed or behind the bed or behind the headboards," so he "immediately went to the left side, began to check the bed area." (Tr. at 134–35, 141). Inspector Warren testified that agents find fugitives hidden between the mattresses and underneath them, behind headboards, behind furniture, and in general, "everywhere," and "in our line of work we've found people hiding-you couldn't imagine where these people hide." (Tr. at 150, 163–64). He therefore looked over the top of the bed to see if there was a "gap or anything between the headboard and the mattresses to the wall." (Tr. at 162).

At that point, Inspector Warren saw that a drawer in the night stand to the left of the bed was open, and he noticed a green box and "could tell there was something there." (Tr. at 96, 141, 163). Inspector Warren then knelt down to look under the bed with the flashlight on his long gun, quickly lifted the mattress, and "actually tried to look to make sure between the headboard and the bed itself there's nobody there." (Tr. at 162). As he stood up and turned to go toward the other agents at the closet, he saw in plain view a box of ammunition in the partially open drawer of the night stand. (Tr. at 145, 149–50, 163; Def. Ex. 3). Inspector Warren immediately yelled to let the other agents know that he had seen the ammunition in order to "heighten [ ] [the agents'] awareness of possibly there could be a firearm within the residence or somebody could have a firearm on them inside the residence," and because he noticed the ammunition before Weeks had been located. (Tr. at 15, 55–56, 97, 114–15, 141–42, 163, 169). Deputy Brock confirmed that the night stand drawer was open, and he testified that he noticed Inspector Warren walking by it almost immediately after going into the bedroom and calling out "we've got a box of ammunition here, or something to that effect." (Tr. at 115, 121–22). He further testified that he did not see or hear anyone

open the drawers while they were in the bedroom searching for Weeks. (Tr. at 122). *Bervaldi*, 226 F.3d at 1267.

Weeks challenges Inspector Warren's credibility, citing his and Edmonds' testimony that the night stand drawer was not open, (Tr. at 262–65, 268–70, 289), and noting inconsistencies in the agents' testimony. [Doc. 48 at 29]. Specifically, Weeks contends that on the day of the suppression hearing, Inspector Warren "changed his story." [*Id.*]. Weeks points out that Agent Sheppard wrote in his report and testified before the Grand Jury that Inspector Warren had also seen a holster in plain view in the night stand. (Tr. at 53–54, 126–27, 169). He adds that Deputy Brock also included in his report that the holster was found in plain view. (Tr. at 126). However, prior to the suppression hearing, Inspector Warren reviewed Agent Sheppard's report and told him that he had only observed the ammunition in plain view. (Tr. at 53–54). Weeks also relies on Deputy Brock's testimony that he observed the drawer was open about three to four inches, (Tr. at 121), whereas Agent Sheppard testified that the drawer was cracked one and a half inches when he first saw it, (Tr. at 49). [Doc. 48 at 31]. Based on the above, Weeks contends that Inspector Warren actually opened and searched the drawer.

While Weeks claims that Inspector Warren "changed his story," the record does not support this contention. Inspector Warren testified at the evidentiary hearing that he observed the ammunition box in the partially open night stand drawer while searching for Weeks and called it out to alert the other agents that Weeks may be armed. (Tr. at 145, 149–50, 163). Deputy Brock and Agent Sheppard testified that they heard Inspector Warren call out "ammunition" or "bullets" before Weeks was apprehended. (Tr. at 15, 56, 96, 115). The agents' testimony that Inspector Warren specifically called out "ammunition" or "bullets" rather than "holster" or "gun" is consistent with Inspector Warren's testimony that he observed only the ammunition box in plain view before Weeks was apprehended. Moreover, the photograph of the partially open drawer taken by Agent Sheppard after Weeks was apprehended depicts how it appeared when the agents found it and also supports Inspector Warren's testimony that he only observed the ammunition box as the holster is not visible in that photograph. (Tr. 51–53; Def. Ex. 3). Thus, the evidence tends to support Agent Sheppard's admission that he was mistaken about the holster being in plain view rather than indicating that Inspector Warren "changed his story."

Weeks' argument regarding the discrepancy in the agents' testimony about how wide the drawer was open does not call into question Inspector Warren's testimony that the drawer was already open when he noticed the ammunition. Deputy Brock observed the drawer from across the bedroom and, although he could see the drawer was open, he could not see anything in the drawer. (Tr. at 121). Deputy Brock testified the drawer was open "three inches, four inches, I don't remember. Something like, maybe five inches." (Tr. at 121). Inspector Warren, who was standing over the night stand, testified the drawer was open only enough to see the box of ammunition, (Tr. at 145), and the photograph Agent Sheppard took depicting the night stand as the agents found it corroborates Inspector Warren's testimony. (Tr. 51–53; Def. Ex. 3). Moreover, regardless of how far the drawer was open at the time the agents saw it, the unequivocal testimony is that the drawer was partially open when the agents were searching for Weeks, placing the ammunition in plain view. While Edmonds recalled that the drawer was closed the evening prior

and Weeks stated that when he came home from a club at around 3:30 a.m., the drawer was closed, (Tr. at 209–10, 262–65, 268–70, 289), neither provided testimony as to the condition of the drawer after they were aroused from bed when the agents began knocking on the door.

Edmonds testified that when she heard the knocking at the door, she nudged Weeks and told him to open the door, but he did not wake up. (Tr. at 193). She then kneeled on the bed to look out the window and saw "a bunch of agents and a guy flashing a light in the window, cars and agents in the driveway of the parking lot." (Tr. at 194–95). Edmonds "got scared and tried to wake [Weeks], shaking him and telling him to get up." (Tr. at 195). Weeks then got up and "ran to the back of the room" toward the closet, and Edmonds left the bedroom to go get her children. (Id.). It is understandable that, in their fear and haste, Weeks and Edmonds would not have checked the condition of the night stand drawer or noticed whether their activity in the bedroom caused the drawer to be ajar, and consequently, they are unable to refute the agents' testimony that the drawer was partially open when they entered the bedroom looking for Weeks. Moreover, Weeks' contention that the drawer was closed when the agents entered the room requires the Court to believe that Inspector Warren was willing to put his life and the lives of his fellow officers at risk by taking time to open the night stand drawer and search for evidence instead of trying to locate and apprehend a fugitive who was believed to be hiding in that bedroom and presented an immediate danger to the agents. Inspector Warren specifically testified that he did not open the drawer as he was focused on finding Weeks, (Tr. at 145), and the Court finds his testimony credible. Weeks' unsubstantiated claim that Inspector Warren opened the night stand drawer is simply not supported by the credible testimony presented at the evidentiary hearing. *See United States v. Pineiro*, 389 F.3d 1359, 1366 (11th Cir. 2004) (recognizing that credibility determinations are within the province of the fact-finder).

Weeks argues that even if the Court finds Inspector Warren's testimony credible, the evidence should still be suppressed because the ammunition was discovered during an unlawful protective sweep. [Doc. 48 at 34]. Specifically, Weeks takes issue with Inspector Warren's search under the mattress and between the headboard and mattress, arguing that these searches went beyond a cursory visual inspection authorized by *Buie*. [*Id.* at 36]. He contends that because the ammunition was seen in plain view during this unlawful search, it must be suppressed. [*Id.*].

 "A police officer may conduct a protective sweep 'if the searching officer possessed a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officer or others.'" *United States v. King*, No. 08–CR–273, 2009 WL 1393572, at *6 (E.D.Wis. May 19, 2009), adopted at *1 (*quoting Buie*, 494 U.S. at 327, 110 S.Ct. 1093) (internal citations and quotation marks omitted). "A protective sweep is essentially a 'frisk' of a residence; it is a limited, minimally invasive, search focused upon ensuring the officers' safety." *Id.*

 Based on the circumstances present in this case, including that the agents were at the apartment to effectuate an arrest warrant on a fugitive wanted for federal firearms violations, Inspector Warren's experience in searching for fugitives and previous incidents in which people had been found hiding in and under beds, and the fact that the agents knew Weeks' crim-

inal history and that he was present in the apartment, the agents had a reasonable basis to conduct a protective sweep, and a search under the mattress was an objectively reasonable part of the protective sweep. *See id.* at *7 (finding search under mattress reasonable where officer testified that he had previously encountered instances of hollowed-out box springs where people could hide and where they knew defendant was a known gang member who had been observed with firearms); *United States v. Lanier,* 285 Fed.Appx. 239, 242 (6th Cir.2008) (unpublished) (affirming district court's decision that officers did not exceed the parameters of a protective sweep when they looked under the bed for a fugitive and found ammunition); *United States v. Williamson,* 250 Fed.Appx. 532, 533 (4th Cir.2007) (unpublished) (finding search under mattress reasonable where officer testified it was "common practice" because he had previously discovered a suspect hiding under a mattress); *United States v. Bass,* 315 F.3d 561, 564 (6th Cir.2002) (finding lifting box spring to check under the bed for any persons hiding constitutionally permissible).

In *United States v. Delancy,* the Eleventh Circuit suggested that a search under the mattress may be beyond the scope of a protective sweep if the bed had a box spring and a mattress but that "[i]f the bed was a platform bed or a futon where lifting the mattress could reveal a person hiding ... lifting the mattress would probably be permissible." 502 F.3d 1297, 1313 n. 10 (11th Cir.2007). However, even if lifting the mattress here was beyond the scope of the lawful protective sweep, evidence observed in plain view may be lawfully seized if the officer did not violate the Fourth Amendment in "arriving at the place from which the incriminating evidence can be plainly viewed." *United States v. Diaz–Garcia,* 808 F.Supp. 784, 789 (S.D.Fla.1992). Here, the agents were lawfully conducting a protective sweep of

an area of the bedroom where Weeks could have been hiding, and the ammunition was not located under the mattress, but was found in plain view in an open drawer of a night stand. Therefore, Inspector Warren was justified in seizing the ammunition. *See United States v. Ford,* 56 F.3d 265, 270 (D.C.Cir.1995) (finding agent lawfully seized gun clip observed in plain view and whose incriminating character was immediately apparent even though search under mattress or behind window shades exceeded scope of protective sweep); *United States v. Getachew,* Criminal No. 3:08–CR–163–D, 2009 WL 211288, at *7–8 (N.D.Tex. Jan. 29, 2009) (finding evidence observed in plain view during protective sweep lawfully seized but that handgun found after opening drawer exceeded the scope of proper protective sweep). Accordingly, based on the totality of the circumstances in this case, the undersigned finds that the ammunition observed in plain view was lawfully seized after a constitutionally permissible protective sweep.

### 3. *Subsequent Search of Apartment*

Weeks challenges the warrantless search of the apartment on several grounds. First, he contends that Edmonds did not consent to the search, and in fact refused to consent when the agents requested. [Doc. 48 at 39]. Next, Weeks argues that even if the Court finds that Edmonds gave verbal consent, her consent was not voluntary because she simply acquiesced to the agents' show of force, and in any event, she did not have the actual or apparent authority to consent to a search of the apartment. [*Id.* at 48–57]. Finally, Weeks argues that any consent Edmonds provided was invalid under *Georgia v. Randolph,* 547 U.S. 103, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006), because he was present and objected to the warrantless

search of the apartment after his arrest. [*Id.* at 57–58].

 "One of the well-established exceptions to the probable cause and warrant requirements is a search which is conducted pursuant to voluntary consent." *United States v. Garcia,* 890 F.2d 355, 360 (11th Cir.1989). *See also Schneckloth,* 412 U.S. at 219, 93 S.Ct. 2041; *United States v. Reynolds,* 526 F.Supp.2d 1330, 1336 (N.D.Ga.2007). "In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." *Garcia,* 890 F.2d at 360. The government bears the burden of proving that consent was voluntary, *United States v. Tovar–Rico,* 61 F.3d 1529, 1536 (11th Cir.1995), and voluntariness of consent is determined on the basis of the totality of the circumstances. *Schneckloth,* 412 U.S. at 227, 93 S.Ct. 2041; *Reynolds,* 526 F.Supp.2d at 1337. Relevant factors include the presence of coercive police procedures, the extent of the person's cooperation with the officer, the person's awareness of his or her right to refuse consent, the person's education and intelligence, and the person's belief that no incriminating evidence will be found. *United States v. Purcell,* 236 F.3d 1274, 1281 (11th Cir. 2001). Ultimately, the burden is on the government to prove that the consent was given voluntarily. *United States v. Bentley,* 151 Fed.Appx. 824, 827 (11th Cir.2005) (unpublished) (*citing United States v. Chemaly,* 741 F.2d 1346, 1352 (11th Cir.1984)); *Tovar–Rico,* 61 F.3d at 1536 (*citing Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)); *United States v. Blake,* 888 F.2d 795, 798 (11th Cir.1989).

### a. Edmonds' Consent

 The record in this case supports a finding that Edmonds voluntarily consented to a search of the apartment. After the agents led Weeks outside of the apartment and had completed the security sweep, Agent Sheppard and Inspector Warren approached Edmonds, who was still sitting on the couch with her two children. (Tr. at 19, 24, 29–30, 57, 147, 170–71). Agent Sheppard asked her if there was anything in the apartment that would hurt the agents, "any bombs, grenades, anything of that nature," to which Edmonds replied "no, there wasn't anything in the house like that." (Tr. at 19, 59). Inspector Warren and Agent Sheppard then explained to her why they were there and "what was going on," and asked Edmonds if they could search, "and she said she didn't have a problem with it or she just said yes." (Tr. at 19, 146–47).

Edmonds, on the other hand, testified that she never gave consent, verbal or otherwise, because it was "not [her] home." (Tr. at 202, 208, 234–35). According to Edmonds, the agents searched the apartment despite her refusing to give consent and then came back into the living room to tell her what they found. (Tr. at 202–03). She testified that after the agents searched the apartment, they then presented her with a consent to search form, which she refused to sign. (Tr. at 31–33, 66–69, 72, 153–54, 176–79; Gov. Ex. 3). She further testified that the agents were yelling at her and threatening her to try to get her to sign the consent form. (Tr. at 201–06, 235). She claims that the agents even offered to give her the $1,300.00 they recovered from the lock box as an incentive to sign the consent form. (*Id.*). After she refused to sign, Edmonds states that Inspector Warren wrote "refused to sign" on the signature line, and asked her to initial that she refused to sign, which she did. (Tr. at 154, 208; Gov. Ex. 3).

Edmonds' version of events was not corroborated by Weeks, who remained in the breezeway outside the apartment and was

able to hear the agents in the apartment while they conducted the search. (Tr. at 297). If the agents yelled at Edmonds and threatened her to get her to sign the consent form, Weeks was in a position to hear such a confrontation, yet he provided no testimony to confirm Edmonds' claim. Edmonds' claim that the agents offered her the $1,300.00 found in the lock box as an incentive to sign the consent form is simply not credible because the agents did not need a written consent to search the apartment since a verbal consent is sufficient. Similarly, Edmonds' claim that the agents asked her to memorialize in writing her refusal to consent *after* they had allegedly conducted an illegal search defies belief.

Edmonds' testimony is also contradicted by the credible testimony of three law enforcement officers. After the agents received verbal consent and searched the apartment, Inspector Warren, in the presence of Agent Sheppard and Deputy Brock, completed a consent to search form in Edmonds' presence and asked her to sign it, but Edmonds, acknowledging that she gave verbal consent, refused to sign the consent form because she did not feel comfortable signing the form. (Tr. at 31–33, 66–69, 72, 127–28, 153–54, 176–79; Gov. Ex. 3). Therefore, Inspector Warren wrote "refused to sign" on the signature line and "gave verbal consent" underneath the signature line, and asked Edmonds to initial by those comments to confirm her verbal consent, which she did. (Tr. at 31–33, 67–68, 71–74, 79–80, 127–28, 154, 177; Gov. Ex. 3). After this conversation, the agents

did not conduct any further search of the apartment. (Tr. at 33–34, 66, 155, 179).

In addition to Edmonds' less than credible version of events, and the inconsistency of her testimony with that of the three law enforcement agents, the Court also discounts her testimony due to her demonstrated loyalty to Weeks, which included residing with him while knowing he was a fugitive from justice.[30] "Having reviewed the testimony at the hearing, noted inconsistencies and/or an apparent lack of candor in [Edmonds'] testimony on multiple fronts, observed the demeanor of the witnesses, and considered the interests of the witnesses, the Court concludes that [Edmonds'] testimony ... is simply not credible." *United States v. Tyler*, No. CR 106–075, 2006 WL 2094538, at *8 (S.D.Ga. July 26, 2006). *See United States v. Stiner*, 551 F.Supp.2d 1350, 1355–56 (M.D.Fla.2008) (officers had no prior knowledge of defendant or contact with him, and girlfriend had "obvious interest" in the defendant remaining free from incarceration); *United States v. Smalls*, 617 F.Supp.2d 1240, 1249–51 (S.D.Fla.2008), adopted at 617 F.Supp.2d at 1243–44. Thus, based on the credible testimony of the law enforcement agents, the Court finds that Edmonds verbally consented to the search of the apartment.

**b. Voluntariness of Consent**

 Weeks argues that the manner in which the armed agents forcibly entered the apartment rendered Edmonds' consent to search invalid. [Doc. 48 at 48–49].[31] Additionally, Weeks argues that after ap-

---

**30.** Edmonds admitted that she was still dating Weeks and wanted him home sooner rather than later. (Tr. at 212–13). Furthermore, Edmonds acknowledged that she came to Atlanta to be with Weeks knowing that he had been convicted of federal firearms offenses, had been barred from travel outside of Massachusetts, failed to report to his sentencing court date, and was prohibited from possess-

ing any firearms but had them in the apartment. (Tr. at 183–84, 199–200, 212, 217–19, 221–22, 225–27; Gov. Ex. 7).

**31.** Weeks also argues that any consent to search in this case was tainted by the initial illegal entry into the apartment. [Doc. 48 at 52]. Having concluded that the initial entry was lawful, the Court rejects this argument.

plying the remaining *Purcell* factors,[32] Edmonds' consent was involuntary. [*Id.* at 50–52]. However, in evaluating the totality of the circumstances, the Court finds that Edmonds' consent was voluntary.

In *United States v. Hidalgo,* 7 F.3d 1566, 1567 (11th Cir.1993), the Eleventh Circuit upheld consent as voluntary under circumstances similar to those presented here. In that case, a SWAT team made the initial entry into the defendant's home, woke the defendant and his wife, and held them on the floor at gunpoint until other officers arrived moments later. Upon arrival, one of the officers advised the defendant that he was under arrest, read the defendant his *Miranda* rights, and, after the defendant invoked his right to be silent, presented the defendant with a consent to search form, which he signed. *Id.* The Eleventh Circuit held the consent was voluntary. *Id.* at 1571.

Here, as in *Hidalgo,* the record supports a finding that Edmonds' will was not overborne by the agents initial entry into the apartment. Although the agents entered and secured the apartment with weapons drawn and voices raised, the consent to search was obtained in a calmer environment. Weapons had been put away, and, during the actual consent process, the agents made no show of force. (Tr. at 23–24, 99–100, 146–47, 171). By the agents' accounts, the encounter was calm and controlled. (Tr. at 16, 18–19, 24, 29–30, 57, 59, 64, 98–100, 119, 146–47, 170–71, 201, 308, 312). The agents did not make any threats or promises to induce Edmonds to consent, never raised their voices, yelled, or physically touched her, never restrained her in any way, never told her that she

was under arrest, and never told her that if she refused, a search warrant could or would be obtained. (Tr. at 28–29, 69, 79–80, 148, 177).

In addition, from the moment the agents entered the apartment, Edmonds cooperated with them by directing the agents to the master bedroom where Weeks could be located. (Tr. at 95, 140). When asked if they could search, Edmonds replied "she didn't have a problem with it or she just said yes." (Tr. at 19, 146–47). During the agents search of the apartment, Edmonds never voiced an objection nor did she rescind her verbal consent. (Tr. at 30, 151). As soon as Edmonds refused to sign the written consent to search form, the agents stopped the search. (Tr. at 33–34, 66, 155, 179). Therefore, this factor weighs in favor of the government.

 Weeks also argues that the fact that no agent advised Edmonds that she had the right to refuse to consent is a basis for finding her verbal consent involuntary. [Doc. 48 at 50]. Edmonds, however, demonstrated her awareness of her right to refuse when she refused to sign the consent to search form that was later presented to her. (Tr. at 31–33, 67–68, 71–74, 79–80, 127–28, 154–55, 177; Gov. Ex. 3). *See United States v. Alim,* 256 Fed. Appx. 236, 239 (11th Cir.2007) (unpublished) (defendant demonstrated that he was not merely acquiescing to the actions of the officers when he refused to execute the preprinted consent-to-search form at the same time that he provided his oral consent to a search of the business premises).[33] Finally, as to whether Edmonds believed incriminating evidence would be found, Weeks points out that Edmonds

---

**32.** As previously stated, "a court should look at several 'indicators': 'the presence of coercive police procedures; the extent of the defendant's cooperation with the officer; the defendant's awareness of his right to refuse consent; the defendant's education and intelligence; and the defendant's belief that no incriminating evidence will be found.'"

*United States v. Mohamed,* 546 F.Supp.2d 1324 (M.D.Fla.2008) (*quoting United States v. Simms,* 385 F.3d 1347, 1355 (11th Cir.2004) (citation omitted)).

**33.** Likewise, the agents' failure to have Edmonds sign a consent to search form does not support the contention that Edmonds did not

was aware that firearms were present in the apartment. [Doc. 48 at 51]. However, this single factor does not require a finding that Edmonds' consent was involuntary in light of the other factors.[34] *See Hudson v. Hall*, 231 F.3d 1289, 1296 (11th Cir.2000) ("In considering whether a consent to search was voluntary, [the courts] examine the totality of the circumstances."); *United States v. Payne*, Criminal Action No. 2:08cr136–MHT, 2008 WL 4671778, at *4–5 (M.D.Ala. Oct. 21, 2008) (finding single factor weighing in favor of defendant not dispositive on whether consent was voluntary).

Considering the totality of these facts and circumstances, the Court finds that Edmonds freely and voluntarily consented to a search of the apartment. *See Hidalgo*, 7 F.3d at 1571; *Garcia*, 890 F.2d at 361 (holding consent voluntary despite officers' refusal to accept suspect's conditional consent to search and threats to obtain a search warrant if suspect did not consent to a full search); *United States v. Long*, 866 F.2d 402, 404 (11th Cir.1989) (holding consent voluntary where officers asked for consent to search, stating that, if refused, they would "dig the place up"); *United States v. Espinosa–Orlando*, 704 F.2d 507, 513 (11th Cir.1983) (holding consent voluntary despite fact that individual was arrested at gunpoint, forced to lie on the ground, and provided consent while one officer had his weapon drawn).

### c. Authority to Consent

Weeks contends that the search based on Edmonds' verbal consent was unconstitutional because Edmonds did not have authority to consent to the search of the apartment. [Doc. 48 at 53–57]. In this regard, Weeks points out that Edmonds was "a guest of a guest of the lessee of the apartment," was not on the lease, did not have her own set of keys to the apartment but would use Weeks' keys, maintained an apartment in Massachusetts, and was not contributing to rental payments or utilities. [*Id.* at 54]. In addition, Weeks relies on Edmonds' testimony that she refused to sign a consent to search form, advising the agents that she could not give consent because it was "not [her] home." (Tr. at 202, 208, 234–35). The Court finds Weeks' argument in this regard unpersuasive.

In *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), the Supreme Court ruled that consent to search a private residence may be provided either by the individual whose property is searched or by "a third party who possesse[s] common authority over or other sufficient relationship to the premises."[35] If the defendant "has already substantially ceded his expectation of privacy"

---

voluntarily consent to the search because Edmonds orally consented and understood what was being asked of her. The lack of a consent to search form does not automatically render consent involuntary. *See United States v. Smith*, 199 Fed.Appx. 759, 761, 763 (11th Cir.2006) (unpublished) (finding oral consent voluntary where defendant did not sign consent to search form); *United States v. Boukater*, 409 F.2d 537, 538 (5th Cir.1969) (oral consent voluntary even where defendant initially refused to sign written waiver, as he reiterated consent after refusing to put anything in writing). *See also United States v. Arvizu*, No. 4:07CR762 HEA, 2008 WL 3853426, at *2 (E.D.Mo. Aug. 14, 2008) (defendant did not sign a consent form but gave

oral consent and understood what was being asked).

34. Weeks makes no argument regarding Edmonds' education and intelligence, and the record shows that Edmonds had obtained a General Equivalency Diploma and had been employed as an insurance agent. (Tr. at 211–12). Therefore, this factor likewise weighs in favor of the government.

35. The Court defined "common authority" as "mutual use of the property by persons generally having joint access or control for most purposes." *Matlock*, 415 U.S. at 171 n. 7, 94 S.Ct. 988.

to the third-party, then the defendant has "assum[ed] the risk" that the third-party might expose his or her privacy interest to others. *United States v. Shelton*, 337 F.3d 529, 535–36 (5th Cir.2003). Moreover, "even if the consenting party does not, in fact, have the requisite relationship to the premises, there is no Fourth Amendment violation if an officer has an objectively reasonable, though mistaken, good-faith belief that he has obtained valid consent to search the area." *United States v. Brazel*, 102 F.3d 1120, 1148 (11th Cir.1997).

In *Illinois v. Rodriguez*, 497 U.S. 177, 187–88, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990), the Supreme Court upheld a warrantless entry based upon third-party consent even though it later turned out that the third-party did not actually possess such authority. Thus, "[a] third party's consent to search is valid if that person has either the 'actual authority' or the 'apparent authority' to consent to a search of that property." *United States v. Kimoana*, 383 F.3d 1215, 1221 (10th Cir. 2004) (citation omitted). It is the reasonableness of the officers' conduct and "not what the consenting party knows" that is the focus of the Fourth Amendment inquiry under the apparent authority doctrine. *United States v. James*, 353 F.3d 606, 615 (8th Cir.2003).

In the present case, Edmonds had at least apparent authority to consent to the search of the apartment and, in fact, did freely and voluntarily consent to the search of the apartment to the extent she "possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *Matlock*, 415 U.S. at 171, 94 S.Ct. 988. Edmonds had access to the apartment, which was apparent since she was living there with her two children, and she appeared to have a right of access to and mutual use of the common areas of the apartment. *See United States v. Burton*, 193 F.R.D. 232, 241 (E.D.Pa.2000) ("Where a property owner gives a party sufficient control of the property such that the property owner has assumed the risk that the third party will consent to a search of the property, the third party will have common authority to consent to a search of those premises."). Furthermore, the agents knew Edmonds was living with Weeks in the apartment complex based on the information provided to them by Edmonds' mother, and once the agents entered the apartment, it was clear that Edmonds had knowledge concerning the layout of the apartment which was demonstrated by the fact that she was able to direct the agents to the bedroom where Weeks was located. (Tr. at 9, 14, 17, 85–87, 94–95, 110, 132, 139–40, 158, 195–96, 199). In fact, Edmonds even acknowledged that she was responsible for taking care of the apartment, including cooking, cleaning, vacuuming, dusting, and making the bed. (Tr. at 8–9, 184–85, 209–10, 219).[36] Thus, it was reasonable for the officers to believe at the time of their entry and protective sweep of the residence that Edmonds had the apparent authority to consent. *Rodriguez*, 497 U.S. at 179–80, 185–86, 110 S.Ct. 2793.[37]

---

36. Weeks points out that Edmonds did not have the permission of Woods to be in the apartment, [Doc. 48 at 54]; however, this does not refute the fact that Edmonds, at the very least, had the apparent authority to consent to the search of the apartment.

37. Weeks also argues that Edmonds did not have the authority to consent to a search of the locked boxes or Weeks' pants or wallet. [Doc. 48 at 55]. As the government points out, [Doc. 39 at 43 n. 33], the search of the pants which led to the discovery of the wallet, was justified when they were provided to Weeks as clothing upon his request since he was wearing a tank top and boxer shorts when arrested. (Tr. at 20, 98–99, 102–04, 118–19, 130, 143, 200; Def. Ex. 1). *See United States v. James*, No. 1:07CR00057 ERW (FRB), 2007 WL 2908886, at *4 (E.D.Mo. Oct.

### d. Weeks' Alleged Objection to the Search

Weeks next contends that even if Edmonds did voluntarily consent to the search, the evidence seized should be suppressed because he voiced an objection to the warrantless search following his arrest. [Doc. 48 at 57–58]. In *Randolph*, the defendant's wife had complained to the police about her husband's drug use and volunteered that there were "items of drug evidence" in their house. 547 U.S. at 107, 126 S.Ct. 1515. The police asked the defendant for permission to search the house, but he refused, and the police then turned to the wife and asked for her permission, which she gave. *Id.* However, the Supreme Court held that a third party resident's consent to search is not valid over the objection of a physically present resident. *Id.* at 120, 126 S.Ct. 1515. The Court explained:

> [I]f a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out. . . . So long as there is no evidence that the police have removed the potentially objecting

tenant from the entrance for the sake of avoiding a possible objection, there is practical value in the simple clarity of complementary rules, one recognizing the co-tenant's permission when there is no fellow occupant on hand, the other according dispositive weight to the fellow occupant's contrary indication when he expresses it.

*Id.* at 121–22, 126 S.Ct. 1515.

This case, however, is distinguishable from *Randolph*, and the Supreme Court's decision in *Matlock*, 415 U.S. at 171, 94 S.Ct. 988, actually controls. In *Matlock*, the defendant was arrested in the front yard of his house, and agents did not ask the defendant for consent to search the house but instead obtained it from a third party in the house. *Id.* The Court upheld the search as being valid pursuant to the third party's common authority over the premises.[38] Thus, *Matlock* controls as long as there is no evidence that the police intentionally removed the potentially objecting co-tenant for the sake of avoiding a possible objection.

There is no evidence that the police deliberately removed Weeks from the scene to prevent him from voicing an objection.[39] Indeed, the record shows that Weeks, who was seated in a breezeway

---

4, 2007) ("The need to search an article of clothing prior to presenting it to an arrestee to wear, is analogous to the need to pat down an individual prior to questioning the individual regarding criminal activity," and finding that "[t]he Supreme Court has repeatedly provided for searches that are required to protect the safety of police officers, and therefore, the search of the jacket before giving it to the [d]efendant was clearly reasonable."). Additionally, "a general consent to a specified area for specific things includes consent to open locked containers that may contain the objects of the search, in the same manner that such locked containers would be subject to search pursuant to a valid warrant." *United States v. Martinez*, 949 F.2d 1117, 1120 (11th Cir.1992). Thus, Edmonds' consent to search the apartment permitted the agents to search the lock boxes.

38. As previously stated, Edmonds had common authority over the apartment in this case.

39. Weeks contends that as the agents led him out of the apartment, he asked if they had a search warrant and said, "you can't search," (Tr. at 274–75). Edmonds did not offer any testimony to corroborate Weeks' version of events, although she was seated on the couch in the apartment when Weeks was apprehended and led out of the apartment, (Tr. at 200), and the credible testimony of three agents contradicts Weeks' claims. Specifically, Inspector Warren testified that he did not recall Weeks ever asking for a warrant or telling the agents they could not search. (Tr. at 167). Likewise, Deputy Brock did not remember Weeks saying anything except that his name was "Jay." (Tr. at 118–19, 128).

**1380**

outside of the apartment, could hear the agents say that firearms had been found, but did not communicate to Edmonds or the agents to stop the search. (Tr. at 276–77, 297). If the agents had wanted to remove Weeks from the scene to prevent him from objecting to the search, they would not have placed him within earshot of the agents conducting the search. "[N]othing in *Randolph* suggests that the police must offer ... an opportunity [for an arrested defendant to object to the search]." *United States v. Travis*, 311 Fed.Appx. 305, 310 (11th Cir.2009) (unpublished). "To the contrary, the *Randolph* Court stated that 'we think it would needlessly limit the capacity of the police to respond to ostensibly legitimate opportunities in the field if we were to hold that reasonableness required the police to take affirmative steps to find a potentially objecting co-tenant before acting on the permission they had already received.'" *Id.* (*quoting Randolph*, 547 U.S. at 122, 126 S.Ct. 1515). Thus, *Matlock* controls, and Weeks, who, based on the credible testimony at the hearing did not express any objection to the search, cannot challenge Edmonds' voluntary consent to search the apartment. *See United States v. Harris*, 526 F.3d 1334, 1339 (11th Cir.2008) ("[T]he extension of the prohibition on warrantless searches applies only to defendants who are present and actually express a refusal to consent."). Accordingly, the undersigned hereby **RECOMMENDS** that Weeks' motion to suppress, [Doc. 14], be **DENIED**.

## B. *Weeks' Motion to Dismiss Counts One and Two, [Doc. 15]*

Weeks moves to dismiss Counts One and Two of the superseding indictment, [Doc. 15], which charge him with possessing a firearm after a felony conviction and while on pretrial release, and possessing a firearm while being a fugitive from justice and on pretrial release, in violation of 18 U.S.C. 922(g)(*l*)-(2), 924(a)(2), 924(e)(1), and 3147(1), [Doc. 24]. Weeks argues that these counts must be dismissed because § 922(g) is unconstitutional as applied to him as the statute exceeds the authority granted to Congress under the Commerce Clause of the United States Constitution. [Doc. 15].

The United States Constitution empowers Congress to "regulate commerce ... among the several States." U.S. Const. art. I, § 8, cl. 3. Courts have historically limited Congress' power under the Commerce Clause to three distinct areas of the law. First, Congress may regulate the use of the channels of interstate commerce. *Heart of Atlanta Motel Inc. v. United States*, 379 U.S. 241, 247–48, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964). Second, Congress may regulate the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. *Shreveport Rate Cases*, 234 U.S. 342, 351, 34 S.Ct. 833, 58 L.Ed. 1341 (1914). Third, Congress may regulate those activities having a substantial effect on interstate commerce. *Maryland v. Wirtz*, 392 U.S. 183, 196, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968), *overruled on other grounds by Nat'l League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976).

Weeks contends that § 922(g), which makes it unlawful for a convicted felon or a fugitive from justice to "possess in or affecting commerce, any firearm or ammunition," exceeds Congressional authority as applied to him. [Doc. 15].

Finally, Agent Munson testified that he never heard Weeks say that no one could search or ask for a search warrant. (Tr. at 315).

However, as Weeks acknowledges, the Eleventh Circuit has previously addressed such challenges to § 922(g) and rejected them. *See United States v. Harris*, 305 Fed.Appx. 552, 557–58 (11th Cir.2008) (unpublished) (recognizing that defendant's facial and as-applied constitutional challenges to § 922(g) "drown in a flood of precedent"); *United States v. Martin*, 243 Fed.Appx. 568, 569 (11th Cir.2007) (unpublished) (rejecting defendant's facial and as-applied challenges to § 922(g)); *United States v. Lamb*, 162 Fed.Appx. 889, 892–93 (11th Cir.2006) (unpublished) (same); *United States v. Scott*, 263 F.3d 1270, 1274 (11th Cir.2001) (same); *United States v. Dupree*, 258 F.3d 1258, 1260 (11th Cir. 2001) (finding § 922(g) a constitutional exercise of the Commerce Clause). *See also United States v. Knight*, 562 F.3d 1314, 1328 (11th Cir.2009) ("To be convicted of possession of a firearm by a convicted felon, the firearm must have affected interstate commerce, and a minimal nexus to interstate commerce is sufficient.") (internal marks omitted); *United States v. Carlisle*, 173 Fed.Appx. 796, 799 (11th Cir. 2006) (unpublished) (declining to require more than a showing that a firearm traveled in interstate commerce to establish nexus). This Court is not free to ignore the Eleventh Circuit precedent on this issue. Accordingly, the undersigned **RECOMMENDS** that Weeks' motion to dismiss, [Doc. 15], be **DENIED**.

## III. *CONCLUSION*

For the foregoing reasons and cited authority, the undersigned Magistrate Judge **RECOMMENDS** that Weeks' motion to suppress evidence, [Doc. 14], and motion to dismiss, [Doc. 15] be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED AND RECOMMENDED,** this 21st day of July, 2009.